# EXHIBIT 1

**CONSTRUCTION LOAN AGREEMENT**

**between**

**FIFTH THIRD BANK, NATIONAL ASSOCIATION**
**as Lender**

**and**

**TAWR PROPERTY OWNER, LTD.,**
**a Texas limited partnership**
**as Borrower**

**Dated as of May 27, 2022**

## TABLE OF CONTENTS

**Page**

1. **DEFINITIONS AND INTERPRETATION** ................................................................ 1
    1.1    Exhibits Incorporated .................................................................................... 1
    1.2    Defined Terms ............................................................................................... 1
    1.3    Singular and Plural Terms ............................................................................. 12
    1.4    Accounting Principles .................................................................................... 13
    1.5    References and Other Terms .......................................................................... 13
2. **THE LOAN; EQUITY REQUIREMENTS; RESERVES** ........................................ 13
    2.1    Agreement to Borrow and Lend ..................................................................... 13
    2.2    Interest ........................................................................................................... 13
    2.3    Principal Payments; Maturity Date ................................................................ 13
    2.4    Loan Fee ........................................................................................................ 13
    2.5    Prepayment .................................................................................................... 13
    2.6    Equity Requirement ....................................................................................... 13
    2.7    Reserve Accounts/Interest Reserve ............................................................... 13
3. **CONDITIONS TO CLOSING** ................................................................................ 14
    3.1    Closing Deliveries .......................................................................................... 14
    3.2    Certifications as of Closing ........................................................................... 19
    3.3    Other Conditions Precedent ........................................................................... 20
    3.4    Termination of Agreement ............................................................................. 20
4. **DISBURSEMENT PROCEDURES** ....................................................................... 20
    4.1    Conditions Precedent to Disbursement of Loan Proceeds ............................. 20
    4.2    Loan Disbursement ........................................................................................ 20
    4.3    Documents Required for Each Construction Disbursement ........................... 22
    4.4    Loan In Balance ............................................................................................. 24
    4.5    Lender's Verification of Contracts ................................................................ 25
    4.6    [Reserved]. ..................................................................................................... 25
    4.7    Frequency of Payouts .................................................................................... 25
    4.8    Consultants .................................................................................................... 25
    4.9    Retainages ...................................................................................................... 26
    4.10   Stored and Unincorporated Materials ............................................................ 26
    4.11   Final Construction Disbursement .................................................................. 26
    4.12   As-Built Plans ............................................................................................... 28
    4.13   Final Waivers ................................................................................................. 28

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 4.14 | Expenses and Advances Secured by Security Instrument | 28 |
| 4.15 | Acquiescence not a Waiver | 28 |
| 4.16 | No Liability for Disbursements | 28 |
| 5. | **REPRESENTATIONS AND WARRANTIES** | 28 |
| 5.1 | Formation, Qualification and Compliance | 28 |
| 5.2 | Execution and Performance of Loan Documents | 29 |
| 5.3 | Financial and Other Information | 29 |
| 5.4 | No Material Adverse Change | 30 |
| 5.5 | Enforceability | 30 |
| 5.6 | Consents | 30 |
| 5.7 | Tax Liability | 30 |
| 5.8 | Usury | 31 |
| 5.9 | Title to Property; Survey | 31 |
| 5.10 | Utility Services | 31 |
| 5.11 | Construction of the Project | 31 |
| 5.12 | Leases | 31 |
| 5.13 | Project Agreements | 31 |
| 5.14 | Governmental Requirements | 32 |
| 5.15 | Rights of Others | 32 |
| 5.16 | Approved Budget; Draw Schedule | 32 |
| 5.17 | Litigation | 32 |
| 5.18 | Name and Principal Place of Business | 32 |
| 5.19 | Delivery of Documents | 32 |
| 5.20 | ERISA | 32 |
| 5.21 | Sanctions Concerns; Anti-Corruption; Other Government Regulations | 32 |
| 5.22 | Foreign Person | 33 |
| 5.23 | Environmental | 33 |
| 5.24 | Eligible Contract Participant | 34 |
| 5.25 | Certificate of Beneficial Ownership | 34 |
| 5.26 | Continuing Nature of Representations and Warranties | 34 |
| 6. | **PROJECT COVENANTS** | 34 |
| 6.1 | Completion of Project | 34 |
| 6.2 | Conformity With Plans | 34 |
| 6.3 | Change Orders | 34 |
| 6.4 | Entry and Inspection | 35 |

# TABLE OF CONTENTS
## (continued)

| | | | |
|---|---|---|---|
| | 6.5 | Project Information | 35 |
| | 6.6 | Permits and Warranties | 35 |
| | 6.7 | Project Contracts | 36 |
| | 6.8 | Protection Against Liens | 36 |
| | 6.9 | Lender Consultant | 36 |
| | 6.10 | Property Management Agreement | 36 |
| | 6.11 | Developer Fees | 36 |
| | 6.12 | Project Agreements with Affiliates of Borrower | 36 |
| | 6.13 | Reappraisal Requirements | 37 |
| 7. | | **MAINTENANCE, OPERATION, PRESERVATION AND REPAIR OF PROPERTY** | 37 |
| | 7.1 | Alterations and Repair | 37 |
| | 7.2 | Compliance | 37 |
| | 7.3 | Changes in Property Restrictions | 37 |
| | 7.4 | Books and Records | 37 |
| | 7.5 | Consultation with Lender Consultant | 37 |
| 8. | | **OTHER AFFIRMATIVE COVENANTS** | 37 |
| | 8.1 | Existence and Control | 37 |
| | 8.2 | Protection of Liens | 37 |
| | 8.3 | Title Insurance Endorsements | 38 |
| | 8.4 | Notice of Certain Matters | 38 |
| | 8.5 | Additional Reports and Information | 38 |
| | 8.6 | Further Assurances | 39 |
| | 8.7 | Financial Statements; Access to Business Information | 39 |
| | 8.8 | Project Accounts | 40 |
| | 8.9 | Keeping Guarantor Informed | 40 |
| | 8.10 | Single Purpose Entity | 40 |
| | 8.11 | Additional Banking Laws | 42 |
| | 8.12 | Tax Shelter Disclosure | 43 |
| | 8.13 | Taxes | 43 |
| | 8.14 | Escrow Deposits | 44 |
| | 8.15 | Certificate of Beneficial Ownership | 44 |
| 9. | | **OTHER NEGATIVE COVENANTS** | 44 |
| | 9.1 | Liens on Property | 44 |
| | 9.2 | Liens on Personal Property | 44 |
| | 9.3 | Removal of Personal Property | 44 |

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 9.4 | Borrower Organizational Documents | 45 |
| 9.5 | Management Agreement | 45 |
| 9.6 | Project Agreements | 45 |
| 9.7 | Limitations on Additional Indebtedness; Other Prohibited Transactions | 45 |
| 9.8 | Distributions | 45 |
| 9.9 | Guarantor Financial Covenants | 45 |
| 9.10 | Debt Service Coverage Ratio | 46 |
| 10. | **INSURANCE, CASUALTY AND CONDEMNATION** | 46 |
| 10.1 | Insurance Coverage | 46 |
| 10.2 | Casualty Loss; Proceeds of Insurance | 48 |
| 10.3 | Condemnation and Eminent Domain | 50 |
| 10.4 | Disbursement of Insurance Proceeds and Awards | 51 |
| 11. | **DEFAULTS AND REMEDIES** | 52 |
| 11.1 | Events of Default | 52 |
| 11.2 | Remedies Upon Default | 55 |
| 11.3 | Cumulative Remedies, No Waiver | 56 |
| 11.4 | Investor Notice and Cure Rights | 56 |
| 11.5 | Purchase Option | 56 |
| 12. | **MISCELLANEOUS** | 57 |
| 12.1 | Nonliability | 57 |
| 12.2 | Indemnification of Lender | 57 |
| 12.3 | Reimbursement of Lender | 59 |
| 12.4 | Obligations Unconditional and Independent | 59 |
| 12.5 | Notices | 59 |
| 12.6 | Survival of Representations and Warranties | 60 |
| 12.7 | Signs | 60 |
| 12.8 | No Third Parties Benefited | 60 |
| 12.9 | Binding Effect, Assignment of Obligations | 60 |
| 12.10 | Counterparts | 60 |
| 12.11 | Prior Agreements; Amendments; Consents | 60 |
| 12.12 | Governing Law | 60 |
| 12.13 | Severability of Provisions | 60 |
| 12.14 | Headings | 60 |
| 12.15 | Conflicts | 60 |
| 12.16 | Time of the Essence | 61 |

# TABLE OF CONTENTS
## (continued)

12.17   Participations, Pledges and Syndication and Securitization ................................................. 61

12.18   Rights to Share Information ................................................................................................... 61

12.19   Pledge to Federal Reserve ..................................................................................................... 61

12.20   Guaranties Unsecured ............................................................................................................ 61

12.21   [RESERVED] .......................................................................................................................... 61

12.22   JURY WAIVER ...................................................................................................................... 62

12.23   JURISDICTION AND VENUE .............................................................................................. 62

12.24   Patriot Act .............................................................................................................................. 62

12.25   Right of Setoff ....................................................................................................................... 62

12.26   Times ...................................................................................................................................... 62

## EXHIBITS

| | | |
|---|---|---|
| A | - | LEGAL DESCRIPTION |
| B | - | PERMITTED ENCUMBRANCES |
| C | - | DISBURSEMENT REQUEST |
| D | - | LOAN DOCUMENTS |
| E | - | APPROVED BUDGET |
| F | - | DRAW SCHEDULE |
| G | - | [RESERVED] |
| H | - | [RESERVED] |
| I | - | INSURANCE REQUIREMENTS |
| J | - | FORM OF BORROWER COMPLIANCE CERTIFICATE |
| K | - | FORM OF GUARANTOR COMPLIANCE CERTIFICATE |
| L | - | FORM OF WAIVER OF LIEN |
| M | - | POST CLOSING ITEMS |

## CONSTRUCTION LOAN AGREEMENT

**THIS CONSTRUCTION LOAN AGREEMENT** (the "Agreement") is executed as of May 27, 2022, by and between **FIFTH THIRD BANK, NATIONAL ASSOCIATION** ("Lender"), and **TAWR PROPERTY OWNER, LTD.,** a Texas limited partnership ("Borrower").

### RECITALS:

A.    Borrower is, as of the date hereof, the holder of fee simple title to the real estate legally described on **Exhibit A** attached hereto and generally located at the southwest corner of East Pflugerville Parkway and Weiss Lane in Pflugerville, Texas (together with all easements and other rights appurtenant thereto, the "Land").

B.    Borrower proposes to develop, construct and lease individual apartment units in the Project (as defined herein).

C.    Borrower has applied to Lender for a loan for the purpose of providing a portion of the funds required to construct the Project and Lender is willing to make the loan upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the above premises, and the mutual covenants and agreements set forth herein, and for one dollar and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **DEFINITIONS AND INTERPRETATION.**

1.1    Exhibits Incorporated.  All exhibits to this Agreement, as now existing and as the same may from time to time be modified, are fully incorporated herein by this reference.

1.2    Defined Terms.  All capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the following meanings:

"Acceptable Accounting Standards" means GAAP applied on a consistent basis or such other sound and accepted accounting standards acceptable to Lender.

"Actual Debt Service" means the actual payments of principal and interest due and payable on the Loan during any Calculation Period.

"Affiliate" means, with respect to any Person, (a) any other Person which directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, (i) such Person or (ii) any general partner, manager or managing member of such Person; (b) any other Person 50% or more of the equity interest of which is held beneficially or of record by (i) such Person or (ii) any general partner, manager or managing member of such Person, and (c) any general partner, limited partner or member of (i) such Person or (ii) any general partner or managing member of such Person.  As used in the previous sentence, "control" means the possession, directly or indirectly, of the power to cause the direction of the management of a Person, whether through voting securities, by contract; family relationship or otherwise.

"Anti-Corruption Law" means all laws, rules, and regulations of any jurisdiction applicable to Borrower and/or its affiliated companies from time to time concerning or relating to bribery or corruption.

"Applicable Laws" means all laws, statutes, ordinances, rules, regulations, judgments, decrees or orders of any state, federal or local Governmental Authority which are applicable to Borrower, Guarantor and/or the Property.

"Appraisal" means a written statement setting forth an opinion of the market value of the Land and the Improvements that (a) has been independently and impartially prepared by a qualified appraiser directly

engaged by Lender or its agent, (b) complies with all applicable federal and state laws, regulations, and guidelines dealing with appraisals or valuations of real property, and (c) has been reviewed as to form and content and approved by Lender, in its sole discretion.

"Approved Budget" means the line item budget for the Project inclusive of all Project Costs, including, without limitation, all hard and soft costs of the Project and the sources of all funds required to pay Project Costs, as reviewed and approved by Lender and as set forth in **Exhibit E** attached hereto, as modified from time to time in accordance with this Agreement.  The initial Approved Budget is attached hereto as **Exhibit E.**

"Architect" means Humphreys & Partners Architects, L.P., a Texas limited partnership, or any other architect for the Project approved by Lender from time to time.

"Architect's Contract" means that certain Standard Form of Agreement Between Architect and Owner by and between Borrower and Architect dated January 22, 2021, which shall provide for the design of all Improvements and construction administration services by the Architect and of which Lender shall be a third party beneficiary.

"Assignment of Leases" means the Assignment of Leases and Rents of even date herewith executed by Borrower in favor of Lender.

"Available Funds" has the meaning provided in Section 4.4 of this Agreement.

"Balancing Deposit" has the meaning provided in Section 4.4 of this Agreement.

"Beneficial Owner" shall mean a "Beneficial Owner" within the meaning given in subparagraph (d) of the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Borrower Compliance Certificate" means a certificate in the form attached hereto as **Exhibit J** executed by Borrower.

"Borrower Entity Documents" means the Partnership Agreement and certificate of limited partnership of Borrower.

"Break Even Date" means the date on which Operating Cash Flow from the Property is projected by Borrower to exceed Debt Service due hereunder, as confirmed by Lender.

"Business Day" has the meaning provided in the Note.

"Calculation Period" means each period for which a calculation of the Debt Service Coverage Ratio is made, as set forth in Section 9.10 of this Agreement.

"Certificate of Beneficial Ownership" means a certificate for Borrower in form and substance approved by Lender which certifies, among other things, all Beneficial Owners of Borrower, as from time to time updated in accordance with the terms of this Agreement.

"Change Orders" means changes in the Plans and/or the scope of the work to be completed under the General Contract.

"City" means the City of Pflugerville, Texas.

"Closing" means the execution and delivery of the Loan Documents.

"Closing Date" means the date upon which the Closing occurs.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Constituent Entities" has the meaning set forth in Section 3.1(t)(iii).

"Construction Account" means Borrower's account with Lender in which Lender will deposit Disbursements hereunder.

"Construction Commencement Date" means the date construction of the Project must commence, which shall be not later than ninety (90) days after the Closing Date.

"Construction Completion" means the date on which all of the following events have occurred: (a) construction of the Project is substantially complete, lien-free and defect free, to the reasonable satisfaction of Lender and certificates of occupancy or the functional equivalent thereof issued by the City, permitting temporary occupancy without condition (or conditions for the completion of minor punchlist items and landscaping), have been issued for the Project, if customarily issued by the City; (b) the Architect has issued a certificate of completion in the form of AIA Document G704 or a substantially similar form reasonably acceptable to Lender; (c) all amounts owing to the General Contractor for the construction of the Project have been paid-in-full (subject to holdbacks for "punch list items" and retention amounts); and (d) all other conditions to the Final Construction Disbursement as provided in Section 4.11 of this Agreement have been satisfied.

"Construction Completion Date" means thirty (30) months after the Construction Commencement Date.

"Construction Contracts" means the General Contract and the Subcontracts.

"Construction Disbursement" means a disbursement of Loan Proceeds for construction of the Project made after the initial disbursement of Loan Proceeds.

"Construction Schedule" has the meaning provided in Section 3.1(q) of this Agreement.

"Contingency" shall mean the "Project Contingency" line item set forth in the Approved Budget.

"Control" and any derivative of such term, including "Controlling" and "Controlled", means, when used with respect to any Person, (a) the direct or indirect beneficial ownership of fifty percent (50%) or more of the outstanding voting securities or voting equity of such Person, or (b) the power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Debt Service" means the greater of Actual Debt Service or Imputed Debt Service; provided, however, that during any period in which a Rate Management Agreement is in effect, the rate of interest used to determine Debt Service shall be the Effective Interest Rate.

"Debt Service Coverage Ratio" means, for any Calculation Period, the ratio of Operating Cash Flow to Debt Service.

"Default" means the occurrence of any event, circumstance or condition which constitutes a breach of or a default under this Agreement or any other Loan Document and which, after the giving of any required notice and/or the passage of any applicable cure period, would constitute an Event of Default under this Agreement or any other Loan Document.

"Default Rate" shall have the meaning set forth in the Note.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory is the subject of any Sanctions.

"Disbursement Request" has the meaning provided in Section 4.3(a) of this Agreement.

"Disbursements" means disbursements by Lender of proceeds of the Loan.

"Distribution" has the meaning provided in Section 9.8 of this Agreement

"Draw Schedule" means the draw schedule for the Project attached hereto as **Exhibit F**, showing the funding sources for the Project and the projected draw schedule for each funding source for the Project, as such draw schedule may hereafter be amended from time to time with, in the case of a material amendment, the reasonable consent of Lender.

"DSCR Resizing Amount" has the meaning given such term in Section 9.10 hereof.

"Effective Interest Rate" means the greater of (a) the Interest Rate and (b) the rate of interest in effect pursuant to a Rate Management Agreement.

"Engineer" means LJA Engineering, Inc., a Texas corporation, or any other engineer for the Project approved by Lender from time to time.

"Engineer's Contract" means that certain Professional Services Agreement by and between Borrower and Engineer dated August 26, 2020, as amended and/or assigned from time to time in accordance with the terms and provisions of this Agreement.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated as of even date herewith executed by Borrower and Guarantor for the benefit of Lender.

"Environmental Laws" has the meaning given to such term in the Environmental Indemnity Agreement.

"Environmental Reports" has the meaning given such term in Section 3.1(g).

"Equity Requirement" has the meaning given to such term in Section 2.6.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"Event of Default" means any event so designated in Section 11.1, or any other section or provision, of this Agreement.

"Excluded Swap Obligation" means any Swap Obligation that arises from any guaranty or collateral pledge with respect to the Obligations that becomes impermissible under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guaranty becomes effective with respect to such related Swap Obligation or, as to Borrower, as of the date of the Security Instrument.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply

with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Final Construction Disbursement" has the meaning provided in Section 4.11 of this Agreement.

"Fiscal Year" means Borrower's or Guarantor's fiscal year, ending on December 31st of each calendar year.

"Force Majeure Event" means an event that is beyond the control of Borrower or Guarantor and is of the kind and/or nature of a war, riot, civil disturbance, natural disaster (including, without limitation, hurricane, tornado, tropical storm or other severe weather conditions) or acts of God (including, without limitation, fire, flood or casualty), governmental or judicial actions or moratoria that do not result from actions of the Borrower, actions or failures of a governmental authority, including, without limitation, changes in laws or codes not reasonably foreseeable or unforeseeable delays in receiving required inspections, licenses, permits or approvals through no fault, action or inaction of Borrower or Guarantor, excusable delays or force majeure delays permitted under the General Contract, or area or industry wide strike that renders it substantially impossible for Borrower to pursue completion of the Project.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"General Contract" means that certain Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price by and between Borrower and the General Contractor dated as of April 27, 2022, as amended from time to time in accordance with the terms and provisions of this Agreement.

"General Contractor" means Baxter Contracting, LLC, a Texas limited liability company, or any other general contractor for the Project approved by Lender from time to time.

"General Partner" means Tacara Weiss Ranch Investors GP, LLC, a Texas limited liability company which is the sole general partner of Borrower.

"Governmental Authority" means any governmental or quasi-governmental agency, board, bureau, commission, department, court, administrative tribunal or other instrumentality or authority having jurisdiction over the Project.

"Gross Revenues" means for any Calculation Period, all revenues of Borrower, determined on a cash basis, derived from the ownership, operation, use, leasing and occupancy of the Property during such period; however, that in no event shall Gross Revenues include (i) any loan proceeds; (ii) proceeds or payments under insurance policies (except proceeds of business interruption insurance); (iii) condemnation proceeds; (iv) any security deposits received from tenants in the Property, unless and until the same are applied to rent or other obligations in accordance with the tenant's lease; (v) any other extraordinary items.

"Guarantor" means Darren B. Casey, a Texas resident, and any Person who now or hereafter partially or fully guarantees the payment or performance of any Obligation to Lender under any Loan Document.

"Guarantor Compliance Certificate" means a certificate in the form of Exhibit K attached hereto executed by Guarantor.

"Guarantor Financial Covenants" has the meaning provided in Section 9.9 of this Agreement.

"Guaranty" means, collectively, all guaranties required pursuant to this Agreement and all guaranties pursuant to which any Person now or hereafter partially or fully guarantees the payment or performance of any Obligations to Lender under any Loan Document, and initially means the Guaranty of Payment and Carry and Guaranty of Non-Recourse Carve-Outs, and the Guaranty of Completion, each dated as of even date herewith given by Guarantor in favor of Lender.

"Hazardous Substances" has the meaning given that term in the Environmental Indemnity Agreement.

"HVCRE ADC" has the meaning set forth in the Economic Growth, Regulatory Relief, and Consumer Protection Act, Pub. L. No. 115-174 (codified at 12 U.S.C. § 1831bb).

"Improvements" means all buildings and other improvements and fixtures now or hereafter comprising any portion of the Property, including, without limitation, Tenant Improvements and all on-site and off-site improvements to be constructed by Borrower required for the construction and operation of the Project.

"Imputed Debt Service" means the payments of principal and interest that would be due and payable on the full Loan Amount during any Calculation Period, assuming required monthly principal and interest payments that would be necessary to fully amortize the Loan over a thirty (30) year period at an interest rate per annum equal to the greater of (a) the then applicable Interest Rate; (b) five and three-quarters percent (5.75%) per annum, (c) two hundred fifty (250) basis points in excess of the rate of ten year United States Treasury Notes as published in The Wall Street Journal (provided, however, if The Wall Street Journal ceases to publish such rate, then the interest rate shall be determined by reference to a comparable publication designated by Lender) on the fifteenth (15th) day preceding the determination of Debt Service Coverage Ratio (or if such day is not a Business Day, the next succeeding Business Day), or (d) if a Rate Management Agreement is in effect, the interest rate provided for in such Rate Management Agreement.

"In Balance" has the meaning provided in Section 4.4 of this Agreement.

"Indebtedness" means, for any Person, without duplication (a) all items (except items of capital stock, of capital surplus, of general contingency reserves or of retained earnings, deferred income taxes, and amount attributable to minority interest if any) that, in accordance with GAAP, would be included in determining total liabilities on a consolidated basis (if such Person should have a subsidiary) as shown on the liability side of a balance sheet as at the date as of which Indebtedness is to be determined, (b) to the extent not included in clause (a) above, (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property or services for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under such loan agreement or credit facility or if such letter of credit was issued, (iii) all amounts required of such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all obligations under leases for which such Person is liable, (v) all indebtedness secured by any mortgage, pledge, lien or conditional sale or other title retention agreement to which any property or asset owned or held is subject, whether or not the indebtedness secured thereby shall have been assumed (excluding non-capitalized leases which may amount to title retention agreements but including capitalized leases), and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss, including any Excluded Swap Obligations, and (c) all indebtedness of others which such Person or any subsidiary of such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person or any subsidiary of such Person has agreed to apply or advance funds (whether by way of loan, stock purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"Interest Rate" has the meaning provided in the Note.

"Interest Reserve" has the meaning provided in Section 2.7(a) of this Agreement.

"Investor GP" means Tacara at Weiss Ranch GP, LLC, a Texas limited liability company which is the sole general partner of Holdings.

"Land" has the meaning provided in Recital A of this Agreement.

"Leases" shall mean all leases now or hereafter executed by or on behalf of Tenants pertaining to the rental of space within the Property.

"Leasing Commissions" means all leasing commissions required to be paid by Borrower in connection with a Lease for retail space in the Property.

"Lender" means Fifth Third Bank, National Association, and its successors and assigns.

"Lender Consultant" means any third-party engineering, architectural or consulting firm hired by Lender to advise and assist Lender in connection with the Project.

"Letter of Credit Documents" means all documents evidencing or securing any letter or letters of credit now or hereafter issued by Lender or any affiliate of Fifth Third Bancorp for the benefit of or at the request of Borrower.

"Liquid Assets" means, without duplication, unrestricted and unencumbered: (i) cash; (ii) certificates of deposit or time deposits with terms of six (6) months or less; (iii) A-1/P-1 commercial paper with a term of six (6) months or less; (iv) U.S. treasury bills and other obligations of the Federal government, all with terms of six (6) months or less; (v) readily marketable securities (excluding "margin stock" that is pledged as collateral under a borrowing agreement) (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), restricted stock and stock (subject to the provisions of Rule 144 of the Securities and Exchange Commission); (vi) bankers' acceptances issued for terms of six (6) months or less by satisfactory financial institutions; (vii) repurchase agreements with terms of six (6) months or less covering U.S. government securities; (viii) a publicly traded fund, other than a hedge fund, that invests in any of the items (i) – (vii), (ix) cash held by entities 100% owned by the Guarantor less those entities' current liabilities; and (x) cash held in revocable trusts of which the Guarantor is the sole beneficiary.

"Loan" means the loan made hereunder and governed by the terms hereof.

"Loan Amount" means an amount not to exceed the least of (i) $44,600,000.00, (ii) sixty percent (60%) of the "as stabilized" appraised value of the Property pursuant to an Appraisal approved by Lender, (iii) sixty-two percent (62%) of the total Project Costs, as verified by Lender from time to time, and (iv) an amount that will result in a Debt Service Coverage Ratio of 1.14 to 1.00 or greater pursuant to an Appraisal approved by Lender.

"Loan Documents" means, collectively, this Agreement, the documents set forth in **Exhibit D** and any other agreement, document or instrument evidencing and/or securing the obligations of Borrower or Guarantor to Lender that Lender requires in connection with the execution of this Agreement or from time to time to effectuate the purposes of this Agreement**,** including, without limitation, any Rate Management Agreement or Letter of Credit Document, together with all amendments, restatements, supplements and modifications thereof.

"Loan Expenses" has the meaning provided in Section 4.2(c) of this Agreement.

"Loan Proceeds" means all amounts advanced as part of the Loan, whether advanced directly to Borrower or otherwise.

"Margin Stock" shall mean any "margin stock" as defined in Regulations U and X.

"Material Adverse Change" means any development, event, condition, obligation, liability or circumstance or set of events, conditions, obligations, liabilities or circumstances or any change(s) which, as determined by Lender in good faith:

      (a)     has prevented, impeded or limited, or could prevent, impede or limit, the enforceability or validity of any Loan Document, the perfection or priority of any lien created under any Loan Document or the remedies of Lender under any Loan Document;

      (b)     has been, or reasonably could be expected to be, material and adverse to the ownership, use enjoyment or value of any of the Property or to the business, operations, prospects, properties, assets, liabilities or condition (financial or otherwise) of Borrower or Guarantor; or

      (c)     has materially impaired, or reasonably would be expected to materially impair, the ability of Borrower or Guarantor to perform any of the Obligations or any of the material obligations under the Project Agreements, or to consummate the transactions under the Loan Documents.

With respect to Guarantor, no Material Adverse Change shall be deemed to have occurred unless such change, if adversely determined, would reasonably be expected to cause Guarantor to fail to comply with the Guaranty.

"Material Change Order" has the meaning provided in Section 6.3(e) of this Agreement.

"Maturity Date" means May 27, 2027.

"Note" means that certain Promissory Note in the stated principal amount of $44,600,000.00 dated as of even date herewith made by Borrower and payable to the order of Lender, as the same may be amended, restated, modified or supplemented and in effect from time to time.

"Obligations" means (a) the payment when and as due and payable of the principal of and interest on the Loan or so much thereof as may be advanced from time to time, and any and all late charges, any additional costs described in Section 4.E of the Note, and all other indebtedness, loans, advances, and each and every obligation and liability evidenced by, owing, arising under or in connection with the Loan, the Security Instrument, the Note, and/or any of the other Loan Documents, together with any extensions, modifications, renewals or refinancings of any of the foregoing; (b) the payment of all other expenses, costs, advances and indebtedness which the Security Instrument by its terms secures; (c) the performance and observance of the covenants and agreements contained in the Security Instrument, the Note and each of the other Loan Documents; (d) the Rate Management Obligations, except for Rate Management Obligations that constitute Excluded Swap Obligations; (e) all obligations to perform or forbear from performing acts, and agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications and restatements thereof, and all reasonable expenses and reasonable attorneys' fees incurred by Lender hereunder or any other document, instrument or agreement related to any of the foregoing; (f) all obligations and liabilities of Borrower to Lender under any Letter of Credit Documents; and (g) all other loans, advances, indebtedness and each and every other obligation or liability of Borrower owed to each of Lender and/or any affiliate of Fifth Third Bancorp or its successors, however created, of every kind and description whether now existing or hereafter arising and whether direct or indirect, primary or as guarantor or surety, absolute or contingent, liquidated or unliquidated, matured or unmatured, participated in whole or in part, created by trust agreement, lease overdraft, agreement or otherwise, whether or not secured by additional collateral, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment or otherwise, and all obligations to perform or forbear from performing acts, and agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications and restatements thereof, and all reasonable expenses and reasonable attorneys' fees

incurred by Lender hereunder or any other document, instrument or agreement related hereto or to any of the foregoing.

"Operating Cash Flow" means, for any Calculation Period, all Gross Revenues actually received in the applicable period arising the ownership and operation of the Property (excluding tenant security deposits and rent paid during such Calculation Period by any tenant for more than the number of months of rental obligations contained in such period) less all Operating Expenses for such Calculation Period (determined on an annualized basis and allocated to such period), as reasonably determined by Lender.

"Operating Expenses" means (i) the actual, reasonable and necessary costs and expenses of owning, operating, managing and maintaining the Property (incurred by Borrower during any Calculation Period), determined on a cash basis (except for real and personal property taxes and insurance premiums, which shall be determined on an accrual basis), including, $225.00 per residential unit as a capital reserve and a management fee in an amount equal to the greater of (1) the actual management fees; or (2) three percent (3.0%) of Gross Revenues, excepting, however, (a) interest or principal due on the Loan; (b) capital expenditures; (c) non-cash charges such as depreciation and amortization; and (d) extraordinary non-recurring expenses as approved by Lender, or (ii) prior to stabilization, the appraiser's expenses, if greater than the amount set forth in the foregoing clause (i).

"Partner" means the General Partner or any limited Partner of Borrower.

"Partnership Agreement" means that certain Agreement of Limited Partnership by and among all of the Partners of Borrower dated on or about the date hereof, as the same may be amended from time to time.

"Party" means any Person (other than Lender) who is a party or signatory to any Loan Document.

"Patriot Act" has the meaning provided in Section 14.24 of this Agreement.

"Permits" has the meaning provided in Section 3.1(e)(ii) of this Agreement.

"Permitted Encumbrances" means, collectively, all matters listed on **Exhibit B** to this Agreement as permitted title insurance exceptions, encumbrances approved by Lender to the extent Lender's approval is required hereunder, Leases permitted under the Security Documents, and such easements and cable and data transmission agreements as are reasonably necessary to develop and operate the Project.

"Permitted Transfers" means, collectively:

    (a)    a transfer of up to 49% in the aggregate of the direct or indirect ownership interests in Borrower so long as there is no change in Control of Borrower;

    (b)    a transfer that occurs by inheritance, devise, bequest or operation of law upon the death of a natural person who is the owner of a direct or indirect ownership interest in Borrower;

    (c)    a transfer to a relative of a natural person who is the owner of a direct or indirect ownership interest in Borrower, trust, partnership or other entity for family estate planning purposes;

    (d)    (i) any sale, assignment or other transfer of any direct or indirect interest in Tacara Investor LP, a Delaware limited partnership ("Investor"), (ii) any sale, assignment or other transfer of all or any part of the right, title and interest of Investor in TAWR Preferred Partnership, LP ("Holdings"), including any rights of Investor granted pursuant to the terms of Limited Partnership Agreement of Holdings (the "Holdings LPA"), subject to transferee's compliance with Lender's standard policies and procedures relating to applicable "know-your-

customer" and anti-money laundering rules and regulations, including the Patriot Act, or (iii) the replacement of the general partner of Holdings or Borrower by the Investor after the occurrence of a Removal Event (as defined in the Holdings LPA) pursuant to the terms of the Holdings LPA.

Notwithstanding anything contained herein or any other Loan Document, Lender's consent shall not be required for a Permitted Transfer.

"Person" means any entity, whether an individual, trustee, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority or otherwise.

"Personal Property" means all of Borrower's right, title and interest, whether now existing or hereafter acquired, in and to all furniture, furnishings, fixtures, machinery, equipment, inventory and other personal property of every kind, tangible and intangible, now or hereafter (i) located on or about the Property, (ii) used or to be used in connection with the Property, or (iii) relating or arising with respect to the Property, but excluding property of Tenants.

"Plans" means the detailed plans and specifications and/or project manual for the construction of the Project, which are prepared in accordance with the terms of the Architect's Contract and Engineer's Contract and approved by Lender and the Lender Consultant, including any shop or field drawings made in furtherance thereof, together with any changes made therein which are permitted under the terms of this Agreement.

"Policies" shall mean those policies of insurance that Borrower is required by Lender to maintain, including those set forth in Article 10 and **Exhibit I** hereof; and each, a "Policy."

"Post-Closing Items" means those items listed in **Exhibit M** hereof.

"Prohibited Transfer" shall have the meaning ascribed to such term in Section 4 of the Security Instrument.

"Project" means the construction and development of the Land and Improvements as a multi-family rental apartment project containing 300 residential units and approximately 14,000 square feet of retail space, in substantial accordance with this Agreement, the Plans and all Applicable Laws.

"Project Agreements" means, collectively, all agreements (other than the Loan Documents) relating to the acquisition, financing, construction or operation of the Property, including but not limited to the Borrower Entity Documents, the Holdings LPA, the Architect's Agreement, the Engineer's Agreement and the Construction Contracts.

"Project Costs" means each of the following items, but only to the extent specifically set forth in the Approved Budget and only to the extent specifically required to complete the Project:

> (a)      The actual hard costs of completing construction of the Improvements, including demolition and environmental remediation costs;

> (b)      The actual costs of acquiring the Land and acquiring and installing the Personal Property;

> (c)      Premiums for title, casualty, liability and other insurance required by Lender;

> (d)      The cost of recording and filing the applicable Loan Documents;

> (e)      Real estate taxes and other assessments which Borrower is obligated to pay during the term of the Loan;

(f)    Interest, fees and similar charges payable by Borrower to Lender hereunder or under the Note or any of the other Loan Documents;

(g)    Legal and other closing costs;

(h)    Architectural, engineering and consulting fees;

(i)    Leasing Commissions, Tenant Improvement Costs, and Tenant Allowances;

(j)    Such other soft costs as Lender approves; and

(k)    All other Loan Expenses.

"Property" means all of Borrower's right, title and interest, whether now existing or hereafter acquired, in and to the Land, all Improvements and fixtures now or hereafter located thereon, and all additions and accretions thereto.

"Property Management Agreement" means a management agreement to be entered into between Borrower and Property Manager with respect to the Project and in form and content acceptable to Lender, which shall be delivered as a Post-Closing Item.

"Property Manager" means Greystar or any other manager for the Property approved by Lender from time to time.

"Quarter" means a calendar quarter.

"Rate Management Agreement" means any agreement, device or arrangement providing for payments which are related to fluctuations of interest rates, exchange rates, forward rates, or equity prices, including, but not limited to, dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants, and any agreement pertaining to equity derivative transactions (e.g., equity or equity index swaps, options, caps, floors, collars and forwards), including without limitation any ISDA Master Agreement between Borrower and Lender or any affiliate of Fifth Third Bancorp, and any schedules, confirmations and documents and other confirming evidence between the parties confirming transactions thereunder, all whether now existing or hereafter arising, and in each case as amended, modified or supplemented from time to time.

"Rate Management Obligations" means any and all obligations of Borrower to Lender or any affiliate of Fifth Third Bancorp, whether absolute, contingent or otherwise and howsoever and whensoever (whether now or hereafter) created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefore), under or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancellations, buy-backs, reversals, terminations or assignments of any Rate Management Agreement.

"Regulations U and X" means Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.

"Reserves" has the meaning provided for in Section 2.7(b) hereof.

"Sanctions" means any sanction administered or enforced by the United States government (including, without limitation, OFAC), the United Nations Security Council, the European Union or other relevant sanctions authority.

"<u>Security Instrument</u>" means that certain Construction Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents dated as of even date herewith from Borrower to and for the benefit of Lender, encumbering the Property, as the same may be amended, restated, modified or supplemented and in effect from time to time.

"<u>Special Form Causes of Loss</u>" means property insurance that insures against loss to covered property from all fortuitous causes except those that are specifically excluded.

"<u>Subcontract</u>" means any contract and/or purchase order between General Contractor and a Subcontractor, or a Subcontractor and another Subcontractor, for the construction or equipping of the Property or for the furnishing of labor or materials for all or any portion of the Property.

"<u>Subcontractor</u>" means any person or entity having a contract with General Contractor or another Subcontractor for the construction, equipping or supplying by such Subcontractor of any portion of the Property.

"<u>Swap Obligation</u>" means any Rate Management Obligation that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"<u>Sworn Construction Cost Statement</u>" has the meaning provided in <u>Section 3.1(o)</u> of this Agreement.

"<u>Taxes</u>" means all taxes, assessments, levies and charges imposed by any public or quasi-public authority having jurisdiction over the Property which are or may affect, or become a lien upon, the Property, or interest therein, or imposed by any Governmental Authority upon Borrower or Lender by reason of their respective interests in the Property or by reason of any payment, or portion thereof, made to Lender hereunder or pursuant to any Obligation or any of the other Loan Documents, other than taxes which are measured by and imposed upon Lender's general net income.

"<u>Tenant Allowances</u>" means any payments required to be made by Borrower to a tenant under a Lease for retail space at the Property to provide funds for the completion of Tenant Improvements and provided for in the Approved Budget.

"<u>Tenant Improvement Costs</u>" means all hard and soft costs of constructing Tenant Improvements.

"<u>Tenant Improvements</u>" means all Improvements required to be made by the Borrower under a Lease for retail space at the Property, or for which the tenant under such Lease is entitled to receive a Tenant Allowance.

"<u>Tenants</u>" means all tenants now or hereafter occupying space within the Property pursuant to validly existing Leases.

"<u>Title Company</u>" means the title company which issues the Title Policy.

"<u>Title Policy</u>" has the meaning provided in <u>Section 3.1(b)</u> of this Agreement.

"<u>To Borrower's knowledge</u>" or "<u>to Guarantor's knowledge</u>" means the current actual knowledge of Darren B. Casey and Ory Kalenkosky with respect to Borrower, and Guarantor, with respect to Guarantor.

"<u>Toxic Mold</u>" means mold or fungus of a type that may pose a risk to human health or the environment or would negatively and materially impact the value of the Property.

"<u>Waiver(s) of Lien</u>" means one or more waivers of mechanic's liens in the form attached as **<u>Exhibit L</u>** hereto.

1.3     Singular and Plural Terms.  Any defined term used in the plural in any Loan Document shall refer to all members of the relevant class and any defined term used in the singular shall refer to any number of the members of the relevant class.

1.4     Accounting Principles.  Any accounting term used and not specifically defined in any Loan Document shall be construed in conformity with, and all financial data required to be submitted under any Loan Document shall be prepared in conformity with Acceptable Accounting Standards.

1.5     References and Other Terms.  Any reference to any Loan Document or other document shall include such document both as originally executed and as it may from time to time be modified. References herein to Articles, Sections and Exhibits shall be construed as references to this Agreement unless a different document is named.  References to subparagraphs shall be construed as references to the same Section in which the reference appears.  The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind.  The terms "including" and "include" mean "including (include) without limitation."

2.     **THE LOAN; EQUITY REQUIREMENTS; RESERVES**.

2.1     Agreement to Borrow and Lend.  Borrower agrees to borrow from Lender, and Lender agrees to lend to Borrower, an amount not to exceed the Loan Amount, on the terms of and subject to the conditions of this Agreement.  The Loan is not a revolving facility, and Borrower shall not have the right to re-borrow any portion of the principal balance of the Loan repaid by Borrower.

2.2     Interest.  Interest on funds advanced hereunder shall be due and payable by Borrower to Lender in the manner set forth in the Note.  Disbursements from the Interest Reserve shall be made in accordance with Section 2.7(a) of this Agreement.  Nothing in this section or Section 2.7(a) shall prevent Borrower from paying interest from a source other than the Interest Reserve.

2.3     Principal Payments; Maturity Date.  The principal of the Loan shall be paid in the manner set forth in the Note.

2.4     Loan Fee.  On the Closing Date, Borrower shall pay to Lender, for Lender's sole account in immediately available funds, a loan fee in the amount of $278,750.00.

2.5     Prepayment.  The Loan shall be prepayable only in accordance with the terms and conditions of the Note.

2.6     Equity Requirement.  As a condition to any Disbursement of Loan Proceeds, Borrower shall have contributed, as cash equity to the Property, an amount equal to not less than the greater of (i) $29,503,493.00, or (ii) fifteen percent (15%) of the "As Complete" appraised value of the Project, as shown in the Appraisal to be delivered pursuant to Section 3.1(h) below (the "Equity Requirement"), of which the amount as determined by Lender to be necessary to prevent the Loan from being classified as an HVCRE ADC transaction shall be required to be maintained in the Property throughout the term of the Loan.  The Equity Requirement must be contributed to the Project prior to the first Disbursement of Loan proceeds.  The sources of the Equity Requirement shall be subject to Lender's approval and once approved, shall not be changed without Lender's approval.

2.7     Reserve Accounts/Interest Reserve.

(a)     The Approved Budget contains a line item in the amount of $1,610,873.00 (the "Interest Reserve").  The Interest Reserve is an unfunded reserve to be disbursed from Loan Proceeds for interest projected to become due on the Loan through the Construction Completion Date.  Provided that no Default shall have occurred and be continuing and no Event of Default exists, advances shall be made by Lender from the Interest Reserve for payment when due of

accrued and unpaid interest on the Loan or, if applicable, for payment of amounts payable and unpaid, in lieu of accrued interest under the Loan, under any Rate Management Agreement. Borrower acknowledges and agrees that the payment of such accrued and unpaid interest, or, if applicable, amounts payable and unpaid, in lieu of accrued interest under the Loan, under any Rate Management Agreement, by the method described herein is for its convenience and benefit. If at any time there are no funds remaining in the Interest Reserve, Lender shall no longer have any obligation for funding of accrued and unpaid interest, or amounts payable and unpaid, in lieu of accrued interest, under any Rate Management Agreement, whereupon Borrower shall be and remain responsible for the continuation of all such payments from funds other than Loan Proceeds. From and after the date the Property begins to generate positive Operating Cash Flow, interest shall be paid first from such Operating Cash Flow and second, to the extent necessary, from the Interest Reserve. If at any time Lender, in its reasonable judgment, estimates that the interest remaining to be paid on the Loan through the earlier of the Maturity Date or the Break Even Date exceeds the undisbursed proceeds of the Loan allocated to the Interest Reserve, Borrower, within ten (10) Business Days after request by Lender, will make a Balancing Deposit in the amount of the shortfall which shall first be exhausted before any further disbursement of the Loan Proceeds to pay interest on the Loan.

(b)     In addition to the Interest Reserve, Lender may establish and set aside out of the undisbursed proceeds of the Loan, reserves (collectively, the "<u>Reserves</u>") in such amounts as may be reasonably estimated by Lender from time to time to provide for payment of the items of Project Cost as the same may accrue or become payable prior to the repayment in full of the Loan. Amounts set aside as Reserves shall not be available for disbursement to Borrower for any purpose other than payment of the item or group or items for which the Reserve was established. Based upon the facts then available to Lender, Lender may adjust and reallocate the amount of any Reserve from time to time.     Items for which Reserves may be established shall include (i) Loan Expenses, (ii) real estate taxes and assessments, (iii) premiums on insurance policies and bonds (if any) required to be furnished by Borrower hereunder, and (iv) Contingencies.

(c)     From and after the date the Property begins to generate positive Operating Cash Flow, Borrower shall deposit all Operating Cash Flow into an account maintained with Lender (the "<u>Retail Lease Escrow Account</u>") for the payment of Leasing Commissions, Tenant Improvement Costs, and Tenant Allowances until the Retail Lease Escrow Account has a balance equal to $450,000.00. In the event that the cost of the Tenant Improvements, Tenant Allowances, or Leasing Commissions for any Lease for retail space in the Property will exceed $450,000.00 in the aggregate, Borrower shall, within ten (10) days after request by Lender, deposit into the Retail Lease Escrow Account the amount of the shortfall.

3.     **CONDITIONS TO CLOSING**.

3.1     <u>Closing Deliveries</u>.  As a condition precedent to the Closing (or, to the extent not delivered prior to Closing, prior to the time set forth on **Exhibit M** attached hereto), Borrower shall furnish to Lender the following, all of which must be strictly satisfactory to Lender and Lender's counsel in form, content and execution:

(a)     <u>Loan Documents</u>.  Fully executed original copies of each of the Loan Documents listed on **Exhibit D** hereto.

(b)     <u>Title Insurance Policy</u>.  At the Closing (or as soon as practicable thereafter, with a marked-up pro-forma policy to be delivered at the Closing), a T-2 2006 Loan Policy ("<u>Title Policy</u>") issued by the Title Company in the full amount of the Loan naming Lender as the insured party and Borrower as the owner and fee simple title holder of the Property, in each case subject only to the Permitted Encumbrances, and insuring the lien of the Security Instrument as a first

and prior lien upon the Property, subject to no exceptions other than exceptions approved by Lender.  To the extent such insurance and endorsements are available in the jurisdiction, the Title Policy must specifically insure Lender for claims and questions related to claims for mechanics' or materialmen's liens and shall include endorsements satisfactory to Lender, including, without limitation, (i) a T-19 Comprehensive endorsement, (ii) a T-19.2 Minerals and Surface Damage endorsement, (iii) a Survey deletion endorsement, (iv) a T-23 Access endorsement, (v) a T-25 Contiguity endorsement, (vi) a T-35 Future Advance endorsement, (vii) a T-33 Variable Rate endorsement, (viii) a T-36.1 Environmental Protection Lien endorsement, (ix) a T-27 Assignment of Rents and Leases endorsement, (x) a Waiver of Arbitration, and (xi) such other endorsements as Lender may require.

(c)      Survey.  A survey ("Survey") of the Land dated no earlier than ninety (90) days prior to the Closing Date, which Survey must be prepared by a registered Texas land surveyor in accordance with the current survey standards of the American Land Title Association and National Society of Professional Surveyors for urban surveys.  The Survey must be certified to Borrower, Lender and the Title Company.  The Survey must satisfy all of Lender's current standards for surveys, as delivered by Lender to Borrower, and include such additional information as may be required by the Title Company to provide survey coverage in the Title Policy.

(d)      Insurance Policies.  Certificates of insurance for all insurance policies required pursuant to Section 10 hereof, or at Lender's reasonable request copies of the insurance policies, provided that the Certificate of Property Insurance reflecting the required builder's risk coverage (as set forth in **Exhibit I**) shall be reviewed and accepted by Lender and Lender's insurance consultant, HUB International, prior to the commencement of vertical construction.

(e)      Utilities; Licenses; Permits.  Evidence satisfactory to Lender that:

(i)      all utility and municipal services required for the construction, occupancy and operation of the Project are available for use and tap-on at the Property, subject only to payment of fees included in the Approved Budget, or will be available after construction thereof as provided in the Construction Contracts, subject only to payment of costs and fees included in the Approved Budget;

(ii)      except as provided below, all permits, licenses and governmental approvals ("Permits"), including all general building permits required to be issued by the applicable Governmental Authority to authorize construction of the Project in accordance with the Plans, required by applicable law to construct the Project have been issued, are in full force and effect and all fee therefor have been fully paid;

(iii)      the storm and sanitary sewage disposal system, the water system and all mechanical systems serving the Project do (or when constructed will) comply with all Applicable Laws, including Environmental Laws and the applicable environmental protection agency, pollution control board and/or other Governmental Authorities having jurisdiction of the Property have issued their Permits for the construction and operation thereof; and

(iv)      all utility, parking, access (including curb-cuts and public street access), construction, recreational and other easements and permits required or, in Lender's judgment, necessary for the construction and use of the Project have been granted or issued;

which evidence shall include a complete list of all Permits required to construct, occupy and operate the Project and copies of all Permits issued to date and all utility letters, licenses and grants of easements.

Notwithstanding the foregoing, permits, licenses and approvals not legally required as of the Closing Date need not be delivered until needed for the applicable stage of construction provided that the general building permit must be delivered as a condition to the first Disbursement of the Loan.

(f)     <u>Geotechnical Report</u>.  A geotechnical report prepared by a licensed soil engineer satisfactory to Lender showing the locations of all borings, containing boring logs for all borings together with recommendations for the design of the foundations, paved areas and underground utilities for the Project, confirming that there are no mining facilities, sink holes or voids beneath the Land, confirming that no conditions exist which could cause subsidence of any portion of the Land and showing no state of facts which could adversely affect the Project.

(g)     <u>Environmental Report</u>.  A written report or reports (collectively, "<u>Environmental Report</u>") prepared at Borrower's sole cost and expense by an independent professional environmental consultant approved by Lender in its sole and absolute discretion, together with a reliance letter addressed to Lender or a separate agreement with such consultant permitting Lender to rely on such report.  The Environmental Report shall be subject to Lender's approval in its sole and absolute discretion.

(h)     <u>Appraisal</u>.  An Appraisal, which must be acceptable to Lender in its sole discretion. Borrower and Lender acknowledge that, as of the date hereof, Lender has reviewed and accepted that certain Appraisal dated March 9, 2022, prepared by Bruce Bailey of CBRE, Inc.

(i)     <u>Documents of Record</u>.  Copies of all covenants, conditions, restrictions, easements and matters of record which affect the Property.

(j)     <u>Searches</u>.  A report from a national search company acceptable to Lender indicating that no judgments, tax or other liens, security interests, leases of personalty, financing statements or other encumbrances (other than Permitted Encumbrances and liens and security interests in favor of Lender) are of record or on file encumbering any portion of the Property, and that there are no judgments, tax liens, pending litigation or bankruptcy actions outstanding with respect to Borrower, General Partner or Guarantor (or, with respect to a Guarantor only, explanations satisfactory to Lender of any judgments or pending litigation in existence).

(k)     <u>Plans and Specifications</u>.  Three hard copies of the final detailed Plans for the Project, as approved by the appropriate Governmental Authority for issuance of the general building permit, including all changes to the date of submission thereof, showing identification thereof by the Architect and generally consistent with any preliminary plans theretofore submitted to Lender, together with evidence satisfactory to Lender that the Plans have been approved by the General Contractor, and the City.  The Plans must be satisfactory to Lender and Lender Consultant in all respects and must be approved in writing by Lender.

(l)     <u>Construction Contracts</u>.  Certified copies of the executed General Contract and, if requested by Lender, such Subcontracts as Lender may identify after review of the General Contractor's sworn statement.  The General Contract shall be (i) for a guaranteed maximum price based upon the Plans as approved by the appropriate Governmental Authority, (ii) shall conform to applicable terms of this Agreement, including, without limitation, provisions regarding retainage, changes in Plans, Change Orders, extras, bonds and construction schedule, and (iii) upon such other terms and provisions as shall be satisfactory to Lender and Lender's counsel in all respects.  Subcontracts covering not less than seventy percent (70%) of the total hard costs for the Project, including, without limitation, demolition, excavation, concrete, electrical, HVAC and mechanical shall be let prior to the initial disbursement of Loan Proceeds.

(m)    General Contractor Financial Statements.  A detailed resume of the credentials and experience of the General Contractor, together with the financial statements for the prior two (2) fiscal years of the General Contractor;

(n)    Architect's and Engineer's Contracts.  A certified copy of the executed Architect's Contract and the executed Engineer's Contract, which shall be in a format and of a scope which is commensurate with industry practice for projects of a similar size and nature, conform to applicable terms of this Agreement, and which must be satisfactory to Lender and Lender's counsel in all respects and which, as to the Architect's Contract, shall provide for inspection services;

(o)    Sworn Statements.  A sworn construction cost statement (the "Sworn Construction Cost Statement") from Borrower on the applicable AIA form (or such other form required by Lender) and a sworn statement from the General Contractor on the applicable AIA form (or such other form required by Lender) setting forth a description of all contracts executed by Borrower or by the General Contractor with respect to the Property, the names and addresses of the contractors, engineers and other parties under those contracts, the date of each such contract and of any supplements or amendments thereto, the nature and scope of the work covered thereby, and the aggregate amounts theretofore paid and thereafter to be paid to each contractor thereunder; and further stating whether said contracts include all of the work required to be done and all of the material necessary for completion of the Project in accordance with the Plans, and, if not, providing sufficient information to enable Lender to estimate the cost of any work or materials not so covered;

(p)    [Reserved.]

(q)    Construction Schedule.  A schedule ("Construction Schedule") in form and content satisfactory to Lender which, among other things, sets forth dates for commencement and completion of the Project, indicates the projected time for performance of the work to be accomplished under the General Contract and each Subcontract, and, if not attached as an exhibit to the General Contract, includes a statement from the General Contractor that, in its best professional judgment, the Construction Schedule is realistic and can be adhered to in completing the Project in accordance with the Plans and by the Construction Completion Date;

(r)    Draw Schedule.  The Draw Schedule;

(s)    Borrower's and Guarantor's Attorney's Opinion.  An opinion of one or more counsel for Borrower, General Partner and Guarantor addressing such issues as Lender may reasonably request, including the following propositions and questions of law:

(i)    that each of Borrower, General Partner and Guarantor (if Guarantor is an entity) is duly organized, validly existing and (with respect to Borrower and General Partner only) in good standing to do business in the state of its organization and in the State of Texas;

(ii)    that Borrower has the necessary legal right, power and authority to conduct its business, to develop the Project and to enter into and perform its obligations under this Agreement and the other Loan Documents;

(iii)    that all necessary corporate, shareholder, membership, partnership approvals, resolutions and directions have been obtained for the development of the Project and the execution of this Agreement and the Loan Documents;

17

(iv)     that the execution and delivery of this Agreement and the other Loan Documents, and the performance thereunder by Borrower, General Partner and Guarantor, as applicable, will comply with all applicable law and will not violate or conflict with the instruments under which Borrower, General Partner and Guarantor, as applicable, is organized or any applicable contracts or agreements;

(v)     that this Agreement and the other Loan Documents have been duly and validly executed and delivered, are enforceable in accordance with their respective terms (subject to bankruptcy laws and laws pertaining to the exercise of creditors' rights generally) and are subject to no defenses of any kind; and

(vi)     that the making of the Loan, the charging of all interest and fees due thereunder do not violate any usury or consumer credit laws.

(t)     Organizational Documents.  A certified copy (certified, where applicable, by the state office in which such documents were filed, and in all other cases by an appropriate representative of the entity) of:

(i)     A copy of the Partnership Agreement for Borrower duly executed by each of the Partners;

(ii)     The Certificate of Limited Partnership of Borrower;

(iii)     The Certificate of Formation and Operating Agreement of the General Partner, and each entity whose authorization is necessary to authorize the execution, delivery and performance of the Loan Documents, or whose authorization is necessary to authorize any other entity whose authorization is necessary in respect thereto, certified by the appropriate officer or representative.  For purposes hereof, Borrower, General Partner, and all such other entities are referred to herein below as the "Constituent Entities";

(iv)     Resolutions by the applicable Constituent Entities authorizing the execution and delivery of the documents evidencing and securing the Loan, certified by an appropriate representative of the Constituent Entities;

(v)     An incumbency certificate, including specimen signatures for all individuals executing any of the Loan Documents, for each Constituent Entity executing any of the Loan Documents, certified by the secretary or other appropriate representative of such entity;

(vi)     Certificates of existence for all limited partnerships and certificates of good standing (or certificates of fact) for all corporations or limited liability companies that are Constituent Entities from their state of formation; and

(vii)     All other instruments and documents concerning the formation and existence of the Constituent Entities, and the execution and delivery of the Loan Documents by the Constituent Entities, required by Lender.

(u)     [Reserved.]

(v)     Real Estate and Personal Property Taxes.  Evidence satisfactory to Lender that real estate taxes due and payable with respect to the Land, if any, have been paid in full and evidence satisfactory to Lender that any personal property taxes due and payable with respect to

the Project, if any, have been paid in full. Copies of the most recent real estate and personal property tax bills for the Property.

(w)  Lender Consultant Report.  A written report(s) prepared at Borrower's expense by the Lender Consultant, which report(s) shall be based upon an evaluation and/or investigation of specific factors and shall describe in detail the investigation and evaluations, as well as the findings.  The report(s) shall include an evaluation of the Plans and their compliance with governmental regulations; an evaluation of the adequacy of the Approved Budget, an evaluation of the Construction Schedule and any other matters required by Lender.

(x)  Financial Statements.  All financial information requested by Lender with respect to Borrower and Guarantor, including but not limited to financial statements for Guarantor for the Quarter ending December 31, 2021.

(y)  Zoning.  A zoning letter from the applicable municipality and/or a zoning attorney licensed in Texas, and such evidence that Property complies with all applicable zoning and other land use laws as Lender shall require in its discretion.

(z)  [Reserved.]

(aa)  [Reserved.]

(bb)  Other Project Agreements.  Copies of the Project Agreements (to the extent not listed above).

(cc)  [Reserved.]

(dd)  Standard Form of Tenant Lease.  A standard form of apartment unit lease for the Project, as approved by Lender.

(ee)  Certificate of Beneficial Ownership.  The Certificate of Beneficial Ownership for Borrower and each control person of Borrower.

(ff)  Other Project Agreements.  To the extent required by Lender, copies of any Project Agreements (to the extent not listed above and to the extent in existence).

(gg)  Additional Documents.  Such other papers and documents regarding Borrower, General Partner and Guarantor or the Property as Lender may require.

3.2  Certifications as of Closing.  As condition precedents to the Closing, the following statements shall be true and correct on the Closing Date, and Borrower hereby represents and warrants to Lender the following:

(a)  The representations and warranties contained in Section 5 of this Agreement are correct in all material respects on and as of the Closing as though made on and as of such date;

(b)  No Default has occurred and is continuing, and no Event of Default has occurred, hereunder, or would result from the execution and delivery of the Loan Documents or the other Project Agreements;

(c)  No default, or event or condition that with notice or the passage of time or both, would result in a default, exists under any of the Project Agreements;

(d)      No litigation has been instituted against Borrower, General Partner or Guarantor which would be reasonably likely to constitute a Material Adverse Change;

(e)      No Material Adverse Change has occurred in the condition or operations, financial or otherwise, of Borrower, General Partner or Guarantor since the date of the most recent financial statements of each such party delivered to Lender; and

(f)      Guarantor is in compliance with the Guarantor Financial Covenants.

3.3      <u>Other Conditions Precedent</u>.  On or before the Closing Date:

(a)      All other Project Agreements shall have been duly authorized, executed and delivered; and

(b)      Borrower shall have complied in all material respects with all terms and conditions applicable to Borrower under each of the Project Agreements.

3.4      <u>Termination of Agreement</u>.  Borrower agrees that all conditions precedent to the Closing will be complied with on or prior to the Closing Date.  If all of the conditions precedent to the Closing hereunder shall not have been performed by the Closing Date, Lender, at its option at any time prior to the Closing, may terminate this Agreement and all of its Obligations hereunder by giving a written notice of termination to Borrower.  In the event of such termination, Borrower shall pay all Loan Expenses which have accrued or been charged prior to such date.

4.      **DISBURSEMENT PROCEDURES**.

4.1      <u>Conditions Precedent to Disbursement of Loan Proceeds</u>.  No Disbursement of Loan Proceeds shall be made by Lender to Borrower at any time unless:

(a)      all conditions precedent to that disbursement have been satisfied, including, without limitation, performance of all of the then pending obligations of Borrower under this Agreement and the Loan Documents;

(b)      the Loan is In Balance;

(c)      Lender shall be reasonably satisfied as to the continuing accuracy of the Approved Budget;

(d)      no Default shall have occurred and be continuing and no Event of Default exists;

(e)      no litigation or proceedings are pending (except as previously disclosed  to Lender in writing, including mechanics lien actions previously disclosed to Lender and for which insurance has been provided to Lender under the Lender's Title Policy) or threatened (including proceedings under Title 11 of the United States Code) against Borrower, General Partner, Guarantor or the Property which litigation or proceedings involve claims that are not insured and that, in Lender's reasonable judgement, would reasonably be expected to result, if adversely determined, in a Material Adverse Change;

(f)      all representations and warranties made by Borrower and Guarantor to Lender herein and otherwise in connection with this Loan continue to be accurate in all material respects, except such representations and warranties shall be deemed modified to the extent they become inaccurate solely as a result of the mere passage of time or the occurrence of events or circumstances that do not violate or breach the terms of this Agreement or any other Loan Document or except as disclosed in writing with the request for Disbursement; and

(g)    if the proposed disbursement is a Construction Disbursement, the additional requirements of Section 4.3 hereof have been satisfied.

4.2    Loan Disbursement.  Subject to the satisfaction of the terms and conditions herein contained, the Loan Proceeds shall be disbursed as follows:

(a)    The Closing shall be made at such time as all of the conditions and requirements of this Agreement required to be performed by Borrower or any other Person prior to the Closing have been satisfied or performed.

(b)    Disbursements for hard costs shall be based on the actual amounts billed by Subcontractors (or by the General Contractor for self-performed work) and shall correlate to, but unless approved by Lender not exceed, the percentage of completion of the component of the Project for which a Disbursement has been requested.  Loan Proceeds disbursed by Lender into an escrow shall be considered to be disbursed to Borrower from the date of deposit into that escrow, and interest shall accrue on those Loan Proceeds from that date.

(c)    Borrower hereby requests and authorizes Lender to make advances directly to itself for payment and reimbursement of all interest, charges, costs and expenses to the extent incurred by Lender in accordance with this Agreement in connection with the Loan, including, but not limited to: (i) without limitation to the establishment of the Interest Reserve, interest due on the Loan, and any points, loan fees, service charges, commitment fees or other fees due to Lender in connection with the Loan; (ii) all amounts due under any Rate Management Agreement; (iii) all title examination, survey, escrow, filing, search, recording and registration fees and charges; (iv) all fees and disbursements of architects, engineers and consultants engaged by Borrower and Lender, including the fees and disbursements of the Architect and the Lender Consultant; (v) all documentary stamp and other taxes and charges imposed by law on the issuance or recording of any of the Loan Documents; (vi) all Appraisal fees; (vii) all title, casualty, liability, payment, performance or other insurance or bond premiums; (viii) all fees and disbursements of legal counsel engaged by Lender in connection with the Loan, including, without limitation, counsel engaged in connection with the enforcement or administration of this Agreement or any of the Loan Documents; and (ix) any amounts required to be paid by Borrower under this Agreement, the Security Instrument or any Loan Document after the occurrence of an Event of Default (all of which are herein collectively referred to as "Loan Expenses").  Notwithstanding the foregoing, any Loan Expenses included in a Disbursement Request (as hereinafter defined) and meeting all requirements for disbursement hereunder shall be paid through disbursement of funds by Lender.  Lender shall give Borrower written notice of any advances that Lender makes directly to itself.

(d)    No disbursement of Loan Proceeds shall be made at any time that the Loan is not In Balance.  No disbursement of Loan Proceeds shall be made except: (i) for payment of the Project Costs actually incurred and expended (or required to be expended) by Borrower, and (ii) in strict accordance with the Approved Budget subject to the reallocations and application of the Contingency described in this and the immediately following paragraph hereof and Change Orders as set forth in Section 6.3 hereof.  Without limiting the immediately preceding sentence, no disbursements of Loan Proceeds shall be made from amounts in Reserves (other than for the payment of costs for which the Reserve was established, but under no circumstances to Borrower for any other purpose) or any cost savings (other than disbursements resulting from reallocations of cost savings for the payment of Project Costs as expressly permitted by this Section 4.2(d) and Section 4.2(e) below).  No amendment of the Approved Budget shall be made without Lender's prior written consent except as set forth in this Agreement.  Borrower shall not reallocate line items within the Approved Budget unless (i) subject to Sections 4.2(e) and 6.3 below, Borrower obtains Lender's prior written consent to such reallocation in its sole discretion, and (ii) such

21

reallocation satisfies the conditions and limits set forth in this <u>Section 4.2(d)</u> and <u>Section 4.2(e)</u> below.  Subject to <u>Section 4.2(e)</u> below, no reallocation of line items within the Approved Budget shall be made unless Borrower can demonstrate to Lender's satisfaction that (1) such reallocation constitutes final cost savings in such line item such that sufficient funds remain in the line item from which the amount is to be reallocated to pay all Project Costs which may be paid from that line item; and (2) no line items in the Approved Budget (other than the line item to which the reallocation is sought) are required, in Lender's reasonable judgment, to be increased.  No reallocations shall be permitted to or from any line items in the Approved Budget for the Interest Reserve.

(e)     So long as Lender's consent isn't otherwise required pursuant to <u>Section 6.3</u> hereof and so long as the Loan remains In Balance pursuant to <u>Section 4.4</u> below, the consent of Lender shall not be required for (a) the use of the Contingency for any Project Costs described in the Approved Budget so long as no more than twenty-five percent (25%) of the Contingency is used prior to the date on which twenty-five percent (25%) of the total Project Costs have been spent, no more than fifty percent (50%) of the Contingency is used prior to the date on which fifty percent (50%) of the total Project Costs have been spent, and no more than seventy-five percent (75%) of the Contingency is used prior to the date on which seventy-five percent (75%) of the total Project Costs have been spent.

(f)     All Disbursements of funds to or for the benefit of the Project, shall be made in material accordance with the Draw Schedule.

(g)     Notwithstanding anything in this Agreement to the contrary, no Loan Proceeds shall be disbursed to pay for Leasing Commissions, Tenant Improvement Costs, or Tenant Allowances, and such costs shall be paid solely from Borrower's funds on deposit in the Retail Lease Escrow Account pursuant to <u>Section 2.7(c)</u>.

4.3     <u>Documents Required for Each Construction Disbursement</u>.  At least ten (10) Business Days prior to, and as a condition of, each Construction Disbursement (or at such other date as is expressly provided for herein) Borrower shall furnish to Lender, the Title Company and to the Lender Consultant the following documents covering such disbursement:

(a)     Borrower's disbursement request ("<u>Disbursement Request</u>") in the form of **<u>Exhibit C</u>** attached hereto.  Each such Disbursement Request shall be deemed to be Borrower's direction to Lender to disburse the funds requested by such Disbursement Request to be disbursed from the proceeds of the Loan in accordance with this Agreement;

(b)     A certificate as to completion and payment authorization on AIA Form G702 and 703 or other form reasonably approved by Lender, properly executed by the General Contractor and the Architect;

(c)     A signed Sworn Owner's Statement and a signed General Contractor's Sworn Statement together with the General Contractor pay application (G702 and G703 or other form acceptable to Lender) signed by the General Contractor and Architect, including signed pay applications from each Subcontractor, together with a Waiver of Lien from General Contractor and each Subcontractor under a Subcontract having a value in excess of $50,000, covering all work and/or materials for which disbursement is to be made to a date specified therein, and covering all work done on the Property, to a reasonably current date, otherwise paid for or to be paid for by Borrower or any other person, all in compliance with the mechanics' lien laws of the State of Texas and with the requirements of Lender and the Title Company (for issuance of interim title endorsements covering such disbursement), together with such invoices, contracts, Change Orders or other supporting data as Lender or the Title Company may require;

22

(d)       Endorsements to the Title Policy (i.e., a T-3 Down Date of Construction Loan Policy) to cover the amount and date of the Construction Disbursement (whether into escrow or otherwise) insuring that the Security Instrument is a first, prior and paramount lien on the Property subject only to Permitted Encumbrances (and to exceptions and objections in the usual form relating to the issuance of a mortgage title insurance policy, which by their nature cannot be waived or removed until the Final Construction Disbursement of the proceeds of the Loan), that nothing has intervened to affect the validity or priority of the Security Instrument, insuring against mechanics' lien claims for work performed prior to the date covered by such continuation, and containing a mechanics' lien interim certification to cover the amount of the Loan then disbursed (including the current Construction Disbursement); which endorsements may be delivered to Lender concurrently with the disbursement of the Loan Proceeds which are the subject of the endorsements;

(e)       A statement indicating what payment requests, if any, have been received by Borrower from the General Contractor or the Subcontractors but have not yet been approved by Borrower for payment;

(f)       Such other papers and documents as the Title Company may require for the issuance of endorsements to the Title Policy for each disbursement of Loan Proceeds;

(g)       If the Construction Schedule has changed, then if requested by Lender an updated Construction Schedule proposed by Borrower with confirmation from each of the General Contractor and  Lender's Consultant that, in its best professional judgment, the Construction Schedule, as updated, is realistic and can be adhered to in completing the Project in accordance with the Plans;

(h)       A report from Lender's Consultant, in form and substance reasonably satisfactory to Lender. Lender shall use good faith efforts to obtain Lender's Consultant's approval (or to notify Borrower of the Lender's Consultant's disapproval and the reasons for such disapproval) as quickly as practicable, provided Lender shall have no obligation to fund a Construction Disbursement until such report and approval from the Lender's Consultant have been received by Lender;

(i)       An updated Draw Schedule, if Borrower is requesting any modification to the Draw Schedule previously approved by Lender;

(j)       A Pending Change Order Log (PCO Log) which describes all anticipated hard cost changes to the Approved Budget which could result in a future Change Order to the General Contract or self-performed work, together with copies of all approved Change Orders and if a change in scope is requested, the written approval of Architect.  The PCO Log shall clearly identify if any cost increases will be covered by Borrower or General Contractor contingency;

(k)       Copies of any Subcontracts, or Change Orders to Subcontracts, not theretofore delivered to Lender and requested by Lender in Lender's sole discretion;

(l)       If the advance of Loan Proceeds is being made concurrently with a disbursement of Borrower equity, all such disbursements have been approved and the funds to be advanced pursuant to such disbursements have been deposited into the Construction Account**;**

(m)       In connection with the first Construction Disbursement, the items set forth in **<u>Exhibit M</u>** attached hereto required to be delivered prior to advance of the first Construction Disbursement;

23

(n)    If Lender shall, or has been requested to, make any payments directly to any General Contractor, Subcontractor, or other Person other than Borrower, (i) a U.S. Internal Revenue Service Form W-9 (Request for Taxpayer Identification Number) for such payee; or (ii) if such payment could be subject to U.S. withholding tax imposed by FATCA, such documentation prescribed by applicable law and such additional documentation reasonably requested by Lender, as may be necessary for Lender to comply with its obligations under FATCA and to determine that such payee has complied with such payee's obligations under FATCA or to determine the amount to deduct and withhold from such payment;

(o)    Upon completion of the foundation and any subsurface Improvements, Borrower shall furnish three (3) copies of a foundation survey showing the appropriate location of the foundation and subsurface Improvements that otherwise complies with the requirements of 3.1(c) hereof.; and

(p)    Upon completion of construction of the Improvements on the Property, Borrower shall furnish three (3) copies of a final as-built Survey showing the location of the Improvements and otherwise complying with the foregoing requirements. Borrower shall have furnished a final plat of survey locating the completed Project, including all paving, driveways, fences and other exterior Improvements, and otherwise in compliance with Section 3.1(c) hereof. Borrower shall also provide a T-3 Completion of Improvements endorsement to the Title Policy.

4.4    Loan In Balance. Anything in this Agreement contained to the contrary notwithstanding, it is expressly understood and agreed that the Loan at all times shall be In Balance (as hereinafter defined). The Loan shall be deemed to be "In Balance" only if after taking into consideration any reallocation of line items or available Contingency as approved by Lender or as expressly permitted without Lender approval by this Agreement, the total of the Available Funds (as hereinafter defined) on a total and on a line item Project Cost basis, in Lender's reasonable judgment, shall equal or exceed on a line item and on a total, aggregate basis, the amount of all Project Costs, including, without limitation:

(a)    the amount required to pay interest on the Loan to the earlier of the Maturity Date or the Break Even Date;

(b)    the amounts to be paid as retainage to persons who have supplied labor, services or materials to the Project including, without limitation, the General Contractor, the Architect, the Engineer and all Subcontractors;

(c)    the amount required, in Lender's sole and absolute judgment, for a contingency reserve for the Project;

(d)    the amount necessary to pay for all unpaid costs incurred or to be incurred in the completion of the construction of the Project, including the cost of purchase and installation of all fixtures and equipment and all work required to finish or improve any portion of the Property to be leased (excluding any funds then on deposit in the Retail Lease Escrow Account); and

(e)    the amount, if any, required to fund the Retail Lease Escrow Account or any Reserves required to be funded, pursuant to the terms of this Agreement, the Partnership Agreement, or any other Project Agreement, concurrent with or prior to the projected date for repayment in full of the Loan.

As used herein, the term "Available Funds" shall mean:

(i)    the undisbursed proceeds of the Loan, net of any unpaid accrued interest on the Loan; plus

     (ii)  any funds then held by Lender in the Interest Reserve (excluding unfunded Loan Proceeds); plus

     (iii)  any other amounts deposited by Borrower pursuant to this <u>Section 4.4</u> and then held by Lender; plus

     (iv)  any portion of the Equity Requirement as may be then held in cash by Lender or deposited in the Construction Account to the extent such funds are designated by the Approved Budget or the Draw Schedule as a source of payment of costs included above.

In the event Lender shall determine in its reasonable discretion that any source of funding (other than the Loan) included in the Approved Budget is no longer available to pay for costs included above, that source of funding shall not be included in the In Balance calculation. Borrower agrees if for any reason Lender reasonably determines that any line item in the Approved Budget is not In Balance, Borrower, within ten (10) days after request by Lender, will deposit with Lender cash in an amount which will place the Loan In Balance (a "<u>Balancing Deposit</u>"), which deposit shall first be exhausted before any further disbursement of the Loan Proceeds shall be made. No interest shall be payable on such amounts. As additional security for the Obligations, Borrower hereby pledges to Lender, and grants to Lender a security interest in, any Balancing Deposit.

    4.5  <u>Lender's Verification of Contracts</u>. Prior to the Closing, and from time to time thereafter, Lender or the Title Company may forward to the General Contractor and any or all Subcontractors listed on the Sworn Construction Cost Statement or the Contractor's Sworn Statement a contract verification to confirm the terms and amount of the General Contract or Subcontract for the General Contractor and each Subcontractor. If there is any discrepancy between the terms and amounts as shown by the Construction Contracts, the sworn statements, and the verifications, Lender may require, as a condition to further Disbursements, that such discrepancies be eliminated to its satisfaction.

    4.6  [<u>Reserved</u>.]

    4.7  <u>Frequency of Payouts</u>. Subsequent to the Closing, Disbursements of Loan Proceeds shall be made, and the conditions precedent to such Disbursements shall be met, from time to time as construction progresses, but no more frequently than once in each calendar month.

    4.8  <u>Consultants</u>. In connection with the transactions contemplated hereby, Lender shall have the right (but not the duty) to employ such consultants, including the Lender Consultant, as it may deem appropriate from time to time, to (a) review and make recommendations regarding the Plans, the Approved Budget and the Construction Schedule, (b) inspect the Property from time to time to insure that the same are being duly constructed and equipped as herein provided, (c) review and make recommendations regarding any elements of a Disbursement Request, (d) obtain information and documentation respecting the Project, attend meetings respecting the Project and formulate reports for Lender pertaining to the Project and (e) perform such other services as Lender from time to time may require, all solely on behalf of Lender. The costs and disbursements of such consultants shall be deemed Loan Expenses and shall be paid by Borrower. Neither Lender nor any such consultants shall be deemed to have assumed any responsibility to, or be liable to, Borrower or Guarantor with respect to any actions taken or omitted by Lender or such consultants pursuant to this Section. Notwithstanding the aforesaid or anything else provided in this Agreement to the contrary, Borrower shall not be entitled to rely on any statements or actions of the Lender Consultant or any of Lender's other consultants and neither the Lender Consultant nor any other consultant retained by Lender shall have the power or authority to grant any consents or approvals or bind Lender in any manner, absent confirmation by Lender of the accuracy of the information conveyed by such consultant to Borrower. Borrower covenants and agrees to cooperate fully with the Lender Consultant and any other consultants retained by Lender, including but not limited to providing such consultants full access to the Property during reasonable business hours and upon

reasonable prior notice, providing coordination between such consultants and the contractors and any representatives of Borrower involved with the Project, providing any information or reports concerning the Project reasonably requested by such consultants, and providing any other assistance reasonably requested by such consultants.

4.9     Retainages.  Disbursement of the available proceeds of the Loan shall be limited to an amount equal to the percentage thereof required by the terms of the Construction Contracts, but in any event Lender shall be entitled in respect of any Construction Contract to retain ten percent (10%) of the value (as certified by Lender's Consultant), of the materials and labor incorporated in the Project from time to time pursuant to such Construction Contract.  Notwithstanding the foregoing, no retainage will be withheld from disbursements of Loan proceeds occurring after the Project is fifty percent (50%) complete, as certified by Lender's Consultant.  However, at no time shall retainage withheld by Lender fall below five percent (5%).  Upon achievement of substantial completion of the Project, and provided no Event of Default has occurred and is continuing, the retainage withheld shall be released, subject to Borrower's compliance with the disbursement requirements set forth herein, including, without limitation, the requirements in Section 4.11.  Lender agrees that retainage shall not apply to Project land cost or Project "soft costs".  Upon certification by the Architect and Lender's Consultant that the work of any Subcontractor has been satisfactorily completed, the remaining retainage applicable to such Subcontract may be paid to the Subcontractor.

4.10     Stored and Unincorporated Materials.  No disbursement for materials purchased by Borrower but not yet installed or incorporated into the Project in excess of Two Hundred Thousand Dollars ($200,000) shall be made without Lender's prior approval of the conditions under which such materials are purchased and stored. In no event shall any such disbursement be made unless the materials involved have been delivered to the Property or stored with a bonded warehouseman, with satisfactory evidence of security, insurance naming Lender as an additional insured both during storage and transit and suitable storage.  Borrower shall provide Lender, in connection with such materials, a copy of a bill of sale or other evidence of title in Borrower, together with a copy of UCC searches against Borrower and the warehouseman, if applicable, indicating no liens or claims which may affect such materials.  Borrower shall provide Lender, Architect and any applicable Governmental Authority or testing authority having jurisdiction over the Project with access to inspect, test or otherwise examine such stored and unincorporated materials during reasonable business hours.  Borrower shall provide to Lender a schedule for the prompt incorporation thereof into the Property, and unless the Lender Consultant has verified and approved the cost and acquisition of said materials, their physical presence at the approved storage site, and the security and protection provided therefor, no disbursement by Lender for such materials shall be made.

4.11     Final Construction Disbursement.  The final actual hard construction cost disbursement and release of retainage ("Final Construction Disbursement") shall occur when the conditions set forth hereinbelow have been complied with, provided that no Default (for which Lender has provided written notice to Borrower) has occurred and is continuing and no Event of Default exists.  No remaining undisbursed Loan Proceeds shall be advanced to Borrower for any Project Cost that has not been actually incurred and expended (or required to be expended) by Borrower in strict accordance with the Approved Budget.  For the avoidance of doubt, and without limiting the generality of the foregoing, the Final Construction Disbursement shall not include amounts remaining in Reserves (including, without limitation, amounts in the Interest Reserve) or amounts attributable to any final cost savings in line items in the Approved Budget.

(a)     The Architect and Borrower have delivered certificates of substantial completion (in form of AIA Document G704 as to Architect) and Borrower has certified in writing to Lender that the Project has been completed substantially in accordance with the Plans;

(b)      Borrower shall have delivered to Lender fully executed copies, in form and content satisfactory to Lender, of (i) AIA Document G704 (Certificate of Substantial Completion); (ii) AIA Document G707 (Consent of Surety to Final Payment), and (iii) AIA Document G707A (Consent of Surety to Reduction in or Partial Release of Retainage);

(c)      Construction Completion shall have occurred and a period of at least thirty (30) days shall have elapsed after Construction Completion.

(d)      Lender has received a conditional Waiver of Lien from the General Contractor and each Subcontractor (conditioned on final payment);

(e)      Lender has received a commitment to issue a T-3 Completion of Improvements endorsement and a T-3 Date Down endorsement to the Title Policy in the full amount of the Loan insuring the Security Instrument as a valid first, prior and paramount lien on the Property, subject only to the Permitted Encumbrances, deleting all exceptions and objections relating to any right to assert claims for mechanics' liens on account of labor and/or materials theretofore furnished to the Property, and any other endorsement reasonably required by Lender;

(f)      All Personal Property shall have been installed free and clear of all liens, title retention agreements and security interests except security interests granted to Lender;

(g)      Borrower shall have furnished to Lender permanent insurance in form and amount and with companies satisfactory to Lender in accordance with the requirements of the Security Instrument;

(h)      Borrower shall have furnished Lender a Certificate of Occupancy and all other governmental licenses and permits required to use, occupy and operate the Property as contemplated from appropriate governmental authorities;

(i)      If required by Lender, an affidavit of completion, in a form authorized under Section 53.106 of the Texas Property Code, shall have been executed by Borrower and duly recorded in the Official Records of Travis County, Texas;

(j)      If required by Lender, Borrower will have provided to Lender evidence of delivery of any notices required by Section 53.107 of the Texas Property Code to applicable Subcontractors that have filed a lien notice;

(k)      Lender shall have received, upon Lender's request, reports from the Title Company or the appropriate filing offices of the state and county in which the Property are located, indicating that no judgments, tax or other liens, security interests, leases of personalty, financing statements or other encumbrances (other than Permitted Encumbrances and liens and security interests in favor of Lender and no other party), are of record or on file encumbering any portion of the Property (or, if any such mechanics' liens exist, the Title Company shall have agreed to insure over such items in Lender's Title Policy), and that there are no judgments or tax liens outstanding in respect to Borrower; and

(l)      All other requirements of this Agreement shall have been complied with.

4.12     <u>As-Built Plans</u>.  If required by Lender, Borrower shall deliver to Lender, within sixty (60) days after Construction Completion, as built Plans for the Project satisfactory to Lender in form and content.

4.13     <u>Final Waivers</u>.  Within sixty (60) days after the Final Construction Disbursement, Borrower shall deliver to Lender a full and complete unconditional Waiver of Lien from General

Contractor and each Subcontractor covering the Final Construction Disbursement and any prior Construction Disbursements for which such items have not previously been delivered.

4.14    <u>Expenses and Advances Secured by Security Instrument</u>.  Any and all advances or payments made by Lender hereunder, from time to time, and any amounts expended by Lender pursuant to this Agreement, together with the reasonable Lender Consultant's fees and attorneys' fees incurred by Lender, if any, and all other Loan Expenses, as and when advanced or incurred, shall be deemed to have been disbursed as part of the Loan and be and become Indebtedness hereunder secured and guaranteed by the Loan Documents to the same extent and effect as if the terms and provisions of this Agreement were set forth therein, whether or not the aggregate of such Indebtedness shall exceed the face amount of the Note.

4.15    <u>Acquiescence not a Waiver</u>.  To the extent that Lender may have acquiesced (whether intentionally or unintentionally) in Borrower's failure to comply with and satisfy any condition precedent to the Closing, to any Construction Disbursement or to any Disbursement of Loan Proceeds, such acquiescence shall not constitute a waiver by Lender of any condition precedent set forth in this Agreement, and Lender at any time thereafter may require Borrower to comply with and satisfy all conditions and requirements of this Agreement.

4.16    <u>No Liability for Disbursements</u>.  Under no circumstances shall Lender be responsible or liable to any Person, including without limitation Borrower, for or on account of any disbursement of, or failure to disburse, the Loan Proceeds or any part thereof, and neither the General Contractor nor any Subcontractor shall have any right or claim against Lender under this Agreement or in connection with the administration of the Loan.  The forgoing shall be in addition to all other limitations on the responsibility and liability of Lender set forth in this Agreement.

5.    **REPRESENTATIONS AND WARRANTIES**.  As a material inducement to Lender's entry into this Agreement, Borrower represents and warrants to Lender that:

5.1    <u>Formation, Qualification and Compliance</u>.

(a)    Borrower is a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Texas and is qualified to conduct business in the State of Texas.  Borrower has full power and authority to conduct its business as presently conducted, to acquire the Property and construct the Improvements, to enter into this Agreement, the other Loan Documents and the Project Agreements to which it is a party and to perform all of its duties and obligations under this Agreement, such other Loan Documents and such Project Agreements. Such execution and performance have been duly authorized pursuant to the Partnership Agreement and Borrower's Certificate of Limited Partnership.

(b)    The sole general partner of Borrower is General Partner, a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and qualified to conduct business in the State of Texas.  General Partner has full power and authority to conduct its business as presently conducted; to enter into any Loan Documents or Project Agreements to which it is a party and to perform all of its duties and obligations under such Loan Documents or Project Agreements; to serve as the general partner of Borrower; and to perform all of its duties and obligations under the Partnership Agreement.

(c)    Guarantor has full power and authority to conduct its business as presently conducted; to enter into any Loan Documents or Project Agreements to which it is a party and to perform all of its duties and obligations under such Loan Documents or Project Agreements.

5.2    <u>Execution and Performance of Loan Documents</u>.

(a)    Borrower and Guarantor have all requisite authority to execute, deliver, and perform their obligations under the Loan Documents to which they are a party.

(b)    The execution and delivery by Borrower and Guarantor of, and the performance by Borrower and Guarantor of their obligations under each Loan Document to which they are a party have been authorized by all necessary action and do not and will not:

(i)    require any consent or approval not heretofore obtained of any Person having any interest in Borrower or Guarantor;

(ii)    violate any provision of, or require any consent or approval not heretofore obtained under, any partnership agreement, articles of incorporation, bylaws, operating agreement or other governing document applicable to Borrower or Guarantor;

(iii)    result in or require the creation of any lien, claim, charge or other right of others of any kind (other than under or as provided for in the Loan Documents) on or with respect to any property now or hereafter owned or leased by Borrower or Guarantor;

(iv)    violate any provision of any Applicable Law presently in effect; or

(v)    constitute a breach or default under, or permit the acceleration of obligations owed under, any contract, loan agreement, lease or other agreement or document to which Borrower or Guarantor is a party or by which Borrower or Guarantor or any of their property is bound.

(c)    None of Borrower or Guarantor is in default, in any respect that is adverse to Lender's interests in or under the Loan Documents or that would reasonably be expected to constitute a Material Adverse Change.

(d)    No approval, license, exemption or other authorization from, or filing, registration or qualification with, any Governmental Authority is required in connection with:

(i)    the execution by Borrower and Guarantor of, and the performance by Borrower and Guarantor of their obligations under, the Loan Documents and Project Agreements to which they are a party (other than Permits required in connection with the construction and occupancy of the Project); and

(ii)    the creation of the liens described in the Loan Documents other than the recording of recordable documents and filing the financing statements.

5.3    <u>Financial and Other Information</u>.  All financial information furnished to Lender with respect to Borrower, General Partner and Guarantor in connection with the Loan (a) is complete and correct in all material respects as of the date or dates indicated (or if no date or dates are indicated, then as of the date of delivery), (b) accurately presents the financial condition of Borrower, General Partner and Guarantor as of the date or dates indicated (or if no date or dates are indicated, then as of the date of delivery) and (c) has been prepared in accordance with Acceptable Accounting Standards; provided that, irrespective of any treatment accorded under consistently applied Acceptable Accounting Standards, all off-balance sheet transactions shall have been disclosed in writing and accompany such other financial information submitted in accordance with this <u>Section 5.3</u>.  To Borrower's knowledge, all other documents and information furnished to Lender with respect to Borrower, General Partner and Guarantor in connection with the Loan are correct in all material respects as of the date or dates indicated (or if no date or dates are indicated, then as of the date of delivery) and complete insofar as completeness is

necessary to give Lender an accurate knowledge of their subject matter. Neither Borrower, General Partner nor Guarantor has any material liability or contingent liability not disclosed to Lender in writing and there is no material lien, claim, charge or other right of others of any kind (including liens or retained security titles of conditional vendors) on any property of any such Person not disclosed in such financial statements or otherwise disclosed to Lender in writing.

5.4     No Material Adverse Change. There has been no Material Adverse Change in the condition, financial or otherwise, or the properties or businesses of Borrower, General Partner or Guarantor since the dates of the latest financial statements furnished to Lender. Since those dates, none of Borrower, General Partner or Guarantor has entered into any material transaction whether or not disclosed in such financial statements or otherwise disclosed to Lender in writing. Further, there are no existing Defaults or Events of Default under any of the Loan Documents and there are no uncured defaults under any of the material Project Agreements.

5.5     Enforceability. The Loan Documents, and any other documents and instruments required to be executed and delivered in connection with the Loan, to which Borrower or Guarantor is a party have been duly authorized, executed and delivered by or on behalf of Borrower or Guarantor a party thereto, and when executed and delivered, will constitute the duly authorized, valid and legally binding obligations of the party required to execute the same and may be enforced strictly in accordance with their respective terms (except to the extent that enforceability may be affected or limited by applicable bankruptcy, insolvency and other similar debtor relief laws affecting the enforcement of creditors' rights generally). No basis presently exists for any claim against Lender under this Agreement, under the Loan Documents or with respect to the Loan, and the Loan Documents and enforcement thereof are not subject to, and neither Borrower nor Guarantor has asserted, any right of rescission, set-off, counterclaim or defense, including the defense of usury. The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personal property (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under Applicable Laws in connection with the execution, delivery, recordation, filing, registration, perfection and/or enforcement of any of the Loan Documents have been paid, or have been paid by Borrower to an escrow agent authorized to make such payment upon recordation.

5.6     Consents. No approval of, or consent from, any Governmental Authority or any other Person not holding a direct or indirect ownership interest in Borrower or Guarantor is required in connection with the execution and delivery by Borrower or Guarantor of this Agreement or any of the other Loan Documents to which each is a party, or compliance by Borrower with, the Loan Documents to which each is a party, or the consummation of the transactions contemplated hereby and thereby, other than those which have been obtained by Borrower and Guarantor and are in full force and effect. If a third party is required under any covenants, conditions and restrictions of record or any other agreement to consent to the use and/or operation of the Property, such approval has been obtained from such party.

5.7     Tax Liability. Each of Borrower and Guarantor has filed all required federal, state and local tax returns and has paid, prior to delinquency, all taxes payable by it (including interest and penalties, but subject to lawful extensions disclosed to Lender and Lender in writing) other than taxes being promptly and actively contested in good faith and by appropriate proceedings. Each of Borrower and Guarantor agrees to maintain adequate reserves for tax liabilities (including contested liabilities) in accordance with Acceptable Accounting Standards.

5.8     Usury. The Loan, including interest rates, fees and charges as contemplated hereby, is an exempted transaction under the Truth In Lending Act, 12 U.S.C. §1601 et seq.; and the Loan does not,

and when disbursed will not, violate the provisions of the usury laws of the State of Texas, any consumer credit laws or the usury laws of any state which may have jurisdiction over this transaction, Borrower or any property securing the Loan.

5.9     Title to Property; Survey.  At the Closing and at all times thereafter until the Loan is paid in full, Borrower will have, subject to the Permitted Encumbrances, good and indefeasible fee simple title to the Property.  Except for the current, non-delinquent taxes and assessments, if any, there are no taxes, assessments or liens pending or, to Borrower's knowledge, threatened, in writing, against the Property for any present or past due taxes or for paving, sidewalk, curbing, sewer or any other street improvements of any kind.  No portion of the Property is now damaged or injured as the result of any fire, explosion, accident, flood or other casualty, nor is any part of the Property subject to any pending or, to Borrower's knowledge, threatened, in writing, eminent domain or condemnation proceeding.  Except as disclosed by the Survey or the Title Policy, the Property does not presently, and upon construction of the Project in accordance with the Plans will not, encroach upon any building line, set back line, sideyard line, or any recorded or visible easement (or other easement of which Borrower is aware or has reason to believe may exist) which exists with respect to the Property.

5.10     Utility Services.  All utility and municipal services required for the construction, occupancy and operation of the Property, including, but not limited to, water supply, storm and sanitary sewage disposal systems, cable services, gas, electric and telephone facilities are presently available for use at the Property or will be upon Construction Completion.  The storm and sanitary sewage disposal system, water system, drainage system and all mechanical systems of the Property comply or will comply with all Applicable Laws, including, without limitation, all Environmental Laws (as defined in the Environmental Indemnity Agreement).

5.11     Construction of the Project.  The Plans have been designed using generally accepted trade practices, are complete in all respects, and contain all details requisite for the construction of the Project which, when built and equipped in accordance therewith, shall be ready for the intended use thereof; the Plans as submitted to Lender are complete and the Plans have not been changed or modified in any way since the date of their submission to Lender.  The General Contract covers all labor, material and equipment required by the Plans or necessary to complete the construction of the Project in accordance with the Plans.  No work or materials have been or will be furnished to the Property during the six (6) months prior to the recordation of the Security Instrument, or, in the event work has occurred or materials furnished during the six (6) months prior to recordation of the Security Instrument, title coverage insuring Lender against any mechanics' liens arising from such work or materials shall be provided under the Title Policy.

5.12     Leases.  As of the Closing Date, there are no Leases for use or occupancy of any part of the Property.

5.13     Project Agreements.  Each of the Project Agreements is in full force and effect.  Neither Borrower, General Partner nor Guarantor, to the extent any of them is a party to any of the Project Agreements, is in default under any of the Project Agreements, and neither Borrower, General Partner nor Guarantor has any knowledge of a default by any other party under any of the Project Agreements.  Neither Borrower, General Partner nor Guarantor has received any notice, whether oral or written, from any other party to any of the Project Agreements alleging any default in the performance or observance of any agreement or covenant or breach of any representation or warranty contained in any of the Project Agreements by any party to any of the Project Agreements, nor have Borrower, General Partner or Guarantor delivered any notice, whether written or oral, to any party under any of the Project Agreements alleging any default in the performance or observance of any agreement or covenant or breach of any representation or warranty contained in any of the Project Agreements by any party to any of the Project Agreements.

31

5.14    <u>Governmental Requirements</u>.  As of the first Construction Disbursement, all Permits and other authorizations of Governmental Authorities required by Applicable Law for the construction of the Project in accordance with the Plans will be validly issued and will be in full force, including but not limited to all building permits.

5.15    <u>Rights of Others</u>.  Borrower is in compliance with all covenants, conditions, restrictions, easements, rights of way and other rights of third parties relating to the Property.

5.16    <u>Approved Budget; Draw Schedule</u>.  The Approved Budget and the Draw Schedule are each based on information deemed reliable by Borrower and represent Borrower's best estimate of all costs required to complete the Project and the sources and payment schedule for payment of such costs.

5.17    <u>Litigation</u>.  To Borrower's knowledge, there are no actions, investigations or proceedings pending or overtly threatened against or affecting the Property, Borrower, General Partner, Guarantor or any property of any of them before any Governmental Authority, except as disclosed to Lender in writing prior to the execution of this Agreement.

5.18    <u>Name and Principal Place of Business</u>.  Borrower presently uses no trade name other than its actual name.  Borrower's principal place of business is 200 East Basse Road, Suite 300, San Antonio, Texas 78209.

5.19    <u>Delivery of Documents</u>.  Borrower has delivered to Lender true and complete copies of each existing lease, contract and other document that grants rights to, or imposes obligations on, Borrower in connection with the Property, and has fully disclosed to Lender in writing the material terms of all existing oral agreements granting or imposing any such rights or obligations.

5.20    <u>ERISA</u>.  Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA.  The assets of Borrower do not and will not constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Sec. 2510.3-101.  Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA.  Transactions by or with Borrower are not and will not be subject to any state or other statute, regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement, including but not limited to the exercise by Lender of any of its rights under the Loan Documents.  Neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the Code) maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).

5.21    <u>Sanctions Concerns; Anti-Corruption; Other Government Regulations</u>.

(a)    Neither Borrower nor, to the knowledge of Borrower, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by, any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on the Office of Foreign Assets Control of the United States Department of the Treasury's List of Specially Designated Nationals, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

(b)    Borrower has conducted its business in compliance with the United States Foreign Corrupt Practices Act of 1977, and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.  Borrower shall not, directly or indirectly, use the proceeds of the Loan for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977.

32

(c)      Borrower is not an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," within the meaning of the Investment Company Act of 1940.

(d)      Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(e)      Borrower is not in violation of any Anti-Corruption Law.

5.22      Foreign Person.  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

5.23      Environmental.  Except as specifically disclosed in the Environmental Report or any subsequent Environmental Report delivered to Lender:

(a)      Neither Borrower nor, to Borrower's knowledge, the Property is in violation of laws relating to Hazardous Substances;

(b)      Neither Borrower nor Guarantor has received, or has received a copy of, any notice of any violation or alleged violation of any laws relating to Hazardous Substances with respect to the Property;

(c)      To Borrower's knowledge, the Property complies with all laws relating to Hazardous Substances as to use and conditions on, under or about the Property including soil and groundwater condition;

(d)      To Borrower's knowledge, there are no pending civil (including actions by private parties), criminal or administrative actions, suits or proceedings affecting Borrower, the Property, or Guarantor with respect to the Property relating to environmental matters ("Environmental Proceedings") and neither Borrower nor Guarantor has any knowledge of any threatened Environmental Proceedings;

(e)      Neither Borrower nor, to Borrower's knowledge, any other Person (including prior to Borrower's ownership of the Property), has used, generated, manufactured, stored or disposed of on, under or about the Property or transported to or from the Property any Hazardous Substances (other than cleaning or other materials brought onto the Property in reasonable quantities as are customarily used in connection with the normal use of the Property and in all cases in compliance with laws relating to Hazardous Substances);

(f)      To Borrower's knowledge, the Property is not subject to any private or governmental lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, Toxic Mold or any other Hazardous Substances;

(g)      To Borrower's knowledge, no Toxic Mold is on or about the Property which requires in quantities and locations requiring remediation pursuant to Environmental Law or commercially reasonable business practices;

(h)      There have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender; and

(i)      To Borrower's knowledge, the Property has not been used (including the period prior to Borrower's acquisition of thereof), permanently or temporarily, as a disposal site or

33

storage site for any Hazardous Substances and the Property, and all parts thereof, are free of all Hazardous Substances other than Hazardous Substances that do not violate any Applicable Laws relating to Hazardous Substances. Without limitation on the foregoing, to Borrower's knowledge: (i) the primary potable or drinking water source does not exceed the EPA Recommended Maximum Contaminant Level Goals set forth under the Safe Drinking Water Act and Clean Water Act, as amended; (ii) there is not and has never been landfill containing decomposable material, petroleum wells, mineral bearing mines, sewage treatment facilities, underground storage tanks, sinkholes, radon or other toxic emissions within the Property, (iii) no electrical transformers, fluorescent light fixtures with ballasts or other equipment containing polychlorinated biphenyls (PCBs) have been located on the Property at any time; and (iv) there are no facilities on the Property which are or have been subject to reporting under any State laws or Section 312 of the Federal Emergency Planning and Community Right to Know Act of 1986 (42 U.S.C. Section 11022), and federal regulations promulgated thereunder.

5.24    <u>Eligible Contract Participant</u>.    Borrower and Guarantor are "eligible contract participants" as defined in the Commodity Exchange Act.

5.25    <u>Certificate of Beneficial Ownership</u>.    The information contained in the Certificate of Beneficial Ownership is true, correct and complete.

5.26    <u>Continuing Nature of Representations and Warranties</u>.    Borrower acknowledges, understands, and agrees that the representations and warranties set forth in this <u>Section 5</u> shall be deemed to be continuing during all times when any or all of the Obligations remain outstanding and such representations and warranties shall be restated in all material respects and made effective as of each date a disbursement is requested and made in accordance herewith.

6.    **PROJECT COVENANTS**.

6.1    <u>Completion of Project</u>.    Borrower shall commence construction of the Project no later than the Construction Commencement Date and thereafter diligently proceed with the Project in accordance with the Plans. Borrower shall complete construction of the Project and satisfy all conditions for Construction Completion on or before the Construction Completion Date.

6.2    <u>Conformity With Plans</u>.    Borrower shall construct the Project in accordance with all Applicable Laws and in substantial conformity with the Plans and in such a manner as not to encroach upon or overhang any easement, right of way or land of others. If any aspect of the Project is not in substantial conformity with the Plans or encroaches upon easements, rights of way or land of others, Lender shall have the right to stop the work and order repair or reconstruction in accordance with the Plans and to withhold further Disbursements until the Project is in substantial compliance with the Plans and/or does not so encroach. Upon written notice from Lender (or Borrower's discovery irrespective of such notice) that any aspect of the Project is not in substantial conformity with the Plans or encroaches upon easements, rights of way or land of others, Borrower shall promptly commence correcting the deviation or encroachment and shall prosecute such work diligently to completion, which in no event shall be later than ninety (90) days after such notice or discovery.

6.3    <u>Change Orders</u>.    The Plans shall not be modified except pursuant to Change Orders. Each Change Order:

(a)    shall be in writing, numbered in sequence, signed by Borrower and, with regard to Material Change Orders (as defined below), submitted to Lender prior to the proposed effectiveness thereof and accompanied by working drawings and a written narrative of the proposed change;

(b)    shall contain an estimate by Borrower of all increases and decreases in itemized Project Costs that would be caused by the change, as well as the aggregate amount of all changes in estimated Project Costs (both increases and decreases) previously made;

(c)    shall contain a certification by Borrower stating the aggregate amount, including both increases and decreases, of all changes in Project Costs reflected in Change Orders for which Lender's written approval has not been obtained or has not been required hereunder;

(d)    shall be certified by Borrower to be in compliance with all Applicable Laws and other requirements; and

(e)    shall be subject to Lender's prior written approval if the Change Order (i) would decrease the number, mix, or density of units within the Property; (ii) would affect any material structural component of the Property; (iii) would decrease the number, mix, or density of units contemplated by the Plans; or (iv) involves changes, including both increases and decreases, in estimated Project Costs of $50,000 or more for each change or series of related changes, or if such Change Order, together with Change Orders not approved by Lender in writing, involve an aggregate amount, including both increases and decreases, of over $150,000 (each change requiring Lender's approval under this Subparagraph (e) being referred to herein as a "Material Change Order"); provided that Borrower shall also produce satisfactory evidence of any consent to any Change Order required on the part of any other party under any Project Agreement.

Borrower shall deliver to Lender and Lender Consultant, upon receipt by Borrower from General Contractor, any Change Order proposed by General Contractor which would, if accepted, constitute a Material Change Order, regardless of whether Borrower intends to accept such Change Order.

6.4    Entry and Inspection.  At all times prior to completion of the Project, upon reasonable notice to Borrower (which notice may be written or oral) (except no notice shall be required when Lender reasonably believes exigent or emergency circumstances exist), Lender and its agents (including but not limited to Lender Consultant) shall, subject to reasonable and customary safety procedures, reasonable requirements imposed by Borrower's insurance policies, and the rights of any Property tenants, have (a) the right of access to the Property and all sites away from the Property where materials for the Project are stored, (b) the right to inspect all labor performed and materials furnished for the Project and (c) during Borrower's normal business hours,  the right to inspect and copy all documents pertaining to the Project.

6.5    Project Information.  From time to time during the course of the Project, within ten (10) days following Lender's reasonable written demand therefor, Borrower shall furnish Lender with reports of Project Costs, progress schedules and contractors' cost breakdowns for the Project, itemized as to trade description and item, showing the name of the contractor(s) and/or subcontractor(s), and including such indirect costs as real estate taxes, legal and accounting fees, insurance, architects' and engineers' fees, loan fees, interest during construction and contractor's overhead.  Without limitation to the foregoing, Borrower shall provide Lender with monthly construction progress and leasing reports.

6.6    Permits and Warranties.  Promptly upon receipt of the same by Borrower, Borrower shall furnish Lender with true and complete copies of (a) all Permits, approvals, exemptions and other authorizations required in connection with the Project and (b) all warranties and guaranties received from any Person furnishing labor, materials, equipment, fixtures or furnishings in connection with the Project.

6.7    Project Contracts.  Borrower shall employ General Contractor as general contractor for the Project pursuant to the General Contract.  Borrower shall not terminate, or modify in any material respect, the General Contract without Lender's prior written consent.  Borrower shall not enter into any other agreement with any Person with respect to the construction and/or development of the Project with a total contract price in excess of $50,000, in the aggregate for all such agreements, without the prior written consent of Lender, such consent not to be unreasonably withheld, conditioned or delayed.  From

time to time during the course of construction of the Project, within ten (10) days after Lender's reasonable written demand therefor, Borrower shall deliver or cause to be delivered to Lender lists of all contractors and Subcontractors employed in connection with the Project. Each such list shall show the name, address and telephone number of each contractor and Subcontractor, a general statement of the nature of the work to be done, the labor and materials to be supplied, the names of materialmen, if known, the approximate dollar value of labor, work and materials itemized with respect to each contractor, Subcontractor and materialman, and the unpaid portion and status of such work or whether such materials have been delivered.

6.8    Protection Against Liens.  In the event that any claim of lien is asserted against the Property by any Person furnishing labor or materials to the Project, Borrower shall immediately give notice of the same to Lender and shall, promptly and in any event within ten (10) Business Days after Lender's written demand, (a) pay and discharge or bond over the same, or (b) contest such lien strictly in accordance with the requirements of Section 2 of the Security Instrument.

6.9    Lender Consultant.  Borrower hereby agrees to pay or reimburse Lender for the reasonable costs charged by the Lender Consultant in connection with review and approval of all plans, specifications, contracts, budgets and related matters, inspection of the Project, and approval of Disbursement Requests.

6.10    Property Management Agreement.  Borrower shall not terminate, or modify in any material respect, the Property Management Agreement without prior written notice to Lender, such consent not to be unreasonably withheld, conditioned or delayed.  Borrower shall execute and deliver, in form and substance satisfactory to Lender, an assignment of the Property Management Agreement, accompanied by the written consent and subordination of the Property Manager.

6.11    Developer Fees.

(a)    Provided that no Event of Default is then existing and continuing, Borrower shall be permitted to pay to Darren Casey Interests, Inc. dba Casey Development Limited ("Developer") (i) a development fee, not to exceed $2,593,622 (the "Development Fee"), which shall be payable in monthly installments based upon the percentage of completion of the Project; provided, however, that the last twenty-five percent (25%) of the Development Fee shall be funded and payable only upon Construction Completion, and (ii) the Soft Cost General Conditions line item in the amount of $250,000, as set forth on the Approved Budget.

(b)    No other fees in connection with the development of the Project shall be paid to Borrower, General Partner, Guarantor, any developer of the Project, or any Affiliate of Borrower or any of the foregoing entities, without the prior written consent of Lender except as expressly permitted under Section 6.12 of this Agreement.

6.12    Project Agreements with Affiliates of Borrower.  Lender hereby consents to the payment of any fees payable to any Partner pursuant to the terms of, and subject to the conditions of, the Partnership Agreement.  Other than as set forth above, Borrower shall not enter into any other contracts or agreements with General Partner, Guarantor or any Affiliate of Borrower or any of the foregoing entities without the prior written consent of Lender.

6.13    Reappraisal Requirements.  Borrower agrees that Lender shall have the right to obtain, at Borrower's expense, a re-appraisal of the Property (a "New Appraisal") prepared by an appraiser selected by and acceptable to Lender and in conformance with governmental regulations applicable to Lender and approved by Lender if an Event of Default has occurred hereunder.  In the event that Lender shall elect to obtain such a New Appraisal, Lender may immediately commission an appraiser acceptable to Lender, at Borrower's cost and expense, to prepare the New Appraisal and Borrower shall fully cooperate with Lender and the appraiser in obtaining the necessary information to prepare such New Appraisal.

7.	**MAINTENANCE, OPERATION, PRESERVATION AND REPAIR OF PROPERTY**. Borrower shall maintain the Property (and all abutting grounds, sidewalks, roads, parking and landscape areas) in good condition and repair, shall operate the Property in a businesslike manner, shall prudently preserve and protect both its own and Lender's interests in connection with the Property, shall not commit or permit any waste or deterioration of the Property, shall not abandon any portion of the Property, and shall not otherwise act, or fail to act, in such a way as to unreasonably increase the risk of any damage to the Property or of any other impairment of Lender's interests under the Loan Documents. Without limiting the generality of the foregoing, and except as otherwise agreed by Lender in writing from time to time, Borrower shall promptly and faithfully perform and observe each of the following provisions:

7.1	Alterations and Repair.	Borrower shall not remove, demolish or materially alter any Improvement (other than the Improvements currently existing on the Property on the date of this Agreement, if any, which are to be partially or totally removed, demolished or altered in connection with the Project in accordance with the Plans), except to make non-structural repairs which preserve or increase the Property's value, and shall promptly restore, in a good and workmanlike manner, any Improvement (or other aspect or portion of the Property) that is damaged or destroyed from any cause.

7.2	Compliance.	Borrower shall comply with all Applicable Laws and requirements of Governmental Authorities (including, without limitation, all requirements relating to the obtaining of Permits), and all rights of third parties, relating to Borrower, the Property or Borrower's business thereon.

7.3	Changes in Property Restrictions.	Borrower shall not initiate, join in or consent to any change in any applicable zoning ordinance, general plan or similar law, or to any private restrictive covenant or any similar public or private restriction on the use of the Property, except with the prior written consent of Lender, not to be unreasonably withheld, conditioned or delayed.

7.4	Books and Records.	Borrower shall maintain complete books of account and other records reflecting the operations of the Property in accordance with Acceptable Accounting Standards.

7.5	Consultation with Lender Consultant.	Borrower shall, and to the extent commercially feasible, will use commercially reasonable efforts to cause the Architect and General Contractor to, respond promptly to questions concerning the design and construction of the Project from Lender Consultant.

8.	**OTHER AFFIRMATIVE COVENANTS**.	While any obligation of Borrower or Guarantor under the Loan Documents remains outstanding, the following provisions shall apply, except to the extent that Lender otherwise consents in writing:

8.1	Existence and Control.	Borrower shall maintain its existence as a limited partnership in good standing under the laws of the State of Texas and qualified to do business in the State of Texas; General Partner shall maintain its existence as a limited liability company in good standing under the laws of the State of Texas and qualified to do business in the State of Texas.	At all times prior to the repayment of the Loan, General Partner shall be the sole general partner of Borrower.

8.2	Protection of Liens.	Borrower shall maintain the lien of the Security Instrument as a valid first priority lien on the Property, subject only to the Permitted Encumbrances, and take all actions, and execute and deliver to Lender all documents, reasonably required by Lender from time to time in connection therewith; and maintain the lien of the Loan Documents on the collateral described therein and take all actions, and execute and deliver to Lender all documents reasonably required by Lender from time to time in connection therewith, including supplemental security agreements, financing statements and other documents extending or perfecting Lender's security interests in such collateral as they exist from time to time.

8.3     <u>Title Insurance Endorsements</u>.  Borrower shall deliver to Lender, at Borrower's sole expense and in form and content reasonably satisfactory to Lender, all endorsements to the Title Policy reasonably required by Lender from time to time.

8.4     <u>Notice of Certain Matters</u>.  Borrower shall give notice to Lender, within fifteen (15) days after Borrower obtains actual knowledge thereof, of each of the following:

(a)     any litigation or claim affecting or relating to the Property and involving an amount in excess of $50,000 and any litigation or claim that might subject Borrower, General Partner or Guarantor to liability in excess of $50,000, whether covered by insurance or not;

(b)     any dispute between Borrower and any Governmental Authority relating to the Property, the adverse determination of which would be reasonably likely to cause a Material Adverse Change;

(c)     any trade name hereafter used by Borrower and any change in Borrower's principal place of business;

(d)     any circumstance that renders the Approved Budget materially inaccurate with respect to any estimated Project Cost;

(e)     any aspect of the Project that is not in substantial conformity with the Plans;

(f)     any Default or Event of Default;

(g)     any default or breach by Borrower or any other party under any Project Agreement, or the receipt by Borrower of any notice of default or breach under any Project Agreement;

(h)     the creation or imposition of any mechanics' lien or other lien against the Property;

(i)     except as disclosed in the Environmental Reports (as defined in the Environmental Indemnity Agreement), the presence of any Hazardous Substances on, under or about the Property; any enforcement, clean-up, removal or other action or requirement of any Governmental Authority relating to any such Hazardous Substances; and the existence of any occurrence or condition on any property in the vicinity of the Property that could cause the Property to be otherwise subject to any restrictions relating to Hazardous Substances; and/or

(j)     any Material Adverse Change in the financial condition of Borrower, General Partner or Guarantor.

8.5     <u>Additional Reports and Information</u>.  Borrower shall deliver to Lender, concurrently with delivery to the third parties noted hereafter, (a) copies of all financial statements and reports (excluding privileged or confidential and proprietary reports that Borrower sends to its Partners), (b) copies of all reports delivered to any party under any of the Project Agreements, and (c) copies of all reports which are available for public inspection or which Borrower is required to file with any Governmental Authority. Borrower also shall deliver to Lender, in form and substance reasonably satisfactory to Lender and within fifteen (15) days of Lender's written request therefore, all other information relating to Borrower, General Partner, the Property, Guarantor or the Loan (or the collateral and security therefor) reasonably required by Lender from time to time.

8.6     <u>Further Assurances</u>.  Borrower shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all documents, and take all actions, reasonably required by

Lender from time to time to confirm the rights created or now or hereafter intended to be created under the Loan Documents, to protect and further the validity, priority and enforceability of the Loan Documents, to subject to the Loan Documents any property intended by the terms of any Loan Document to be covered by the Loan Documents, or otherwise to carry out the purposes of the Loan Documents and the transactions contemplated thereunder, provided that no such documents increase the liability or obligations of Borrower or Guarantor.

8.7    <u>Financial Statements; Access to Business Information</u>.  Borrower represents and warrants that the financial statements for Borrower and the Property previously submitted to Lender are true, complete and correct in all material respects, disclose all actual and contingent liabilities of Borrower or relating to the Property and do not contain any untrue statement of a material fact or omit to state a fact material to such financial statements.  No Material Adverse Change has occurred in the financial condition of Borrower or the Property from the dates of said financial statements until the date hereof.  Borrower shall furnish to Lender such financial information regarding Borrower, its general partner, as the case may be, the Property and any guarantor of the Loan as Lender may from time to time reasonably request, which shall include, without any further request therefore:

(a)    <u>Financial Statements</u>.  After Construction Completion, Borrower shall deliver to Lender, (a) by August 15th of each calendar year, an internally certified statement of profit and loss for Borrower and for Borrower's operations in connection with the Property and an internally certified balance sheet for Borrower (collectively, "<u>Borrower Financials</u>"), each dated as of June 30th for such calendar year, and (b) by March 31st of each calendar year, year-end Borrower Financials, in each case together with all supporting schedules certified by a senior officer of Borrower or an independent certified public accountant acceptable to Lender stating that such materials (i) were prepared in accordance with Acceptable Accounting Standards, (ii) fairly present Borrower's financial condition, (iii) show all material liabilities, direct and contingent, (iv) fairly present the results of Borrower's operations, and (v) disclose the existence of any hedge and/or off-balance sheet transactions.

(b)    <u>Operating Statements</u>.  After Construction Completion and within forty-five (45) days after the end of each Quarter, an operating statement for the Property for the Quarter then ended, together with a current rent roll for the Property, each certified by Borrower as being true and correct in all material respects and in form and substance satisfactory to Lender.  Borrower shall also deliver to Lender, concurrently with Borrower's delivery of the quarterly operating statement, a cash flow statement for the Property for the Quarter then ended (to the extent not reflected in the quarterly operating statement), in form and substance satisfactory to Lender.

(c)    <u>Borrower Covenant Compliance Reporting</u>.  Simultaneously with each delivery of Borrower Financials in accordance with Section 8.7(a) above, a Borrower Compliance Certificate, signed by a duly authorized officer of Borrower.

(d)    <u>Guarantor's Financial Statements and Guarantor Compliance Certificate</u>.  Borrower shall cause Guarantor to deliver to Lender by March 31st of each calendar year, a financial statement as of the end of the calendar year, certified by Guarantor as (1) true, complete and correct, (2) fairly presenting Guarantor's financial condition, and (3) showing all material liabilities, direct and contingent, and otherwise in a form substantially similar to the form of financial statements previously submitted to Lender by Guarantor, unless otherwise approved by Lender in writing (collectively, "<u>Guarantor Financials</u>").  Guarantor shall deliver to Lender a Guarantor Compliance Certificate, signed by Guarantor, simultaneously with each delivery of Guarantor Financials.

(e)    <u>Borrower Tax Returns</u>.  Borrower shall deliver to Lender, within thirty (30) days after filing, a copy of the federal income tax return filed for Borrower for the prior calendar year,

39

including all supporting schedules, in each case prepared by a certified public accountant acceptable to Lender.

(f)    <u>Guarantor's Tax Returns</u>.  Borrower shall cause Guarantor to deliver to Lender, within thirty (30) days after filing, a copy of the federal income tax return filed including all supporting schedules for Guarantor for the prior calendar year, in each case prepared by a certified public accountant acceptable to Lender.

(g)    <u>Books and Records</u>.  Borrower shall maintain proper books of accounts and records and enter therein complete and accurate entries and records of all of its transactions in accordance with Acceptable Accounting Standards, or reasonable cash accounting methods consistently applied in accordance with the past practices and give representatives of Lender access thereto at all reasonable times, including permission to: (i) examine, copy and make abstracts from any books and records and such other information which might be helpful to Lender in evaluation the status of the Obligations as it may reasonably request from time to time, and (ii) communicate directly with any of Borrower's officers, employers, agents, accountants or other financial advisors with respect to the business, financial conditions and other affairs of Borrower.

8.8    <u>Project Accounts</u>.  All deposit and other accounts of Borrower shall be established with Lender as demand deposit accounts.  Borrower shall maintain a checking account with Lender for the deposit of all income from, and the payment of all expenses relating to,  the use and operation of the Property.  In addition, all reserve accounts required to be established and maintained pursuant to this Agreement, the Partnership Agreement or otherwise shall be established and maintained with Lender as a non-interest bearing deposit accounts in the name of Borrower and shall be funded as required by this Agreement (or, if not required pursuant to this Agreement, the Partnership Agreement or such other agreement as is applicable).  Borrower hereby grants and pledges to Lender, a first lien and security interest in each account maintained under this Section, and Borrower pledges such accounts (and the funds therein, interest earned thereon and proceeds thereof) as collateral security for the payment of all Obligations and the performance of all other obligations of Borrower hereunder and under the Loan Documents.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any of such accounts (or the funds therein, interest earned thereon and proceeds thereof) or permit any lien to attach thereto, or any levy to be made thereon.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the Uniform Commercial Code.  Upon the occurrence of an Event of Default, Lender may use any funds in such accounts to repay the Obligations or for such other purpose as is permitted pursuant to the terms of the Loan Documents.

8.9    <u>Keeping Guarantor Informed</u>.  Borrower must keep Guarantor informed of Borrower's financial condition and business operations, the condition and all uses of the Property, including all changes in condition or use, and any and all other circumstances that might affect Borrower's ability to pay or perform its obligations under the Loan Documents and the Project Agreements.

8.10    <u>Single Purpose Entity</u>.  Borrower covenants and agrees that it has not and shall not:

(a)    engage in any business or activity other than the acquisition, ownership, development, construction, operation and maintenance of the Property, and activities incidental thereto;

(b)    acquire or own any material asset other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the construction, operation or maintenance of the Property;

(c)     merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)     (i) fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (ii) dissolve or otherwise terminate, or fail to comply with the provisions of Borrower's organizational documents, or (iii) amend or modify Borrower's certificate of limited partnership or amend or modify any provision of the Partnership Agreement except as expressly permitted under this Agreement;

(e)     own any subsidiary or make any investment in or acquire the obligations or securities of any other person or entity;

(f)     fail to hold its assets in its own name, or commingle its assets with the assets of any of its partners, Affiliates, or of any other person or entity or transfer any assets to any such person or entity other than distributions on account of equity interests in Borrower, to the extent, if any, permitted hereunder, and properly account for, and any other payments expressly permitted hereunder;

(g)     incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan, except unsecured trade and operational Indebtedness incurred with trade creditors in the ordinary course of its business of owning and operating the Property in such amounts as are normal and reasonable under the circumstances, provided that such Indebtedness is not evidenced by a note and is paid when due;

(h)     allow any Person other than Guarantor to pay its debts and liabilities in tendering a cure, in its sole discretion, or fail to pay its debts and liabilities solely from its own assets;

(i)     fail to maintain its records, books of account and bank accounts separate and apart from those of the Partners and any Affiliates of Borrower or its Partners, or fail to prepare and maintain its own financial statements in accordance with Acceptable Accounting Standards;

(j)     enter into any contract or agreement with Guarantor, or any Partners or Affiliate of Borrower or Guarantor, except as approved in writing by Lender or upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than Guarantor or such Partner or Affiliate of Borrower or Guarantor;

(k)     seek dissolution or winding up, in whole or in part;

(l)     fail to correct any known misunderstandings regarding the separate identity of Borrower;

(m)     guaranty or become obligated for the debts of any other entity or person, or hold itself out to be responsible or pledge its assets or credit worthiness for the debts of another person or entity, or allow any person or entity to hold itself out to be responsible or pledge its assets or credit worthiness for the debts of Borrower (except for Guarantor);

(n)     make any loans or advances to any third party, including any Partner or Affiliate of Borrower;

41

(o)     unless Borrower is a disregarded entity for Federal income tax purposes, fail to file its own tax returns or to use separate contracts, purchase orders, stationery, invoices and checks;

(p)     fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the entity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any Partner or Affiliate of Borrower);

(q)     fail to allocate fairly and reasonably among Borrower and any third party (including General Partner, Guarantor or any Affiliate of any of the foregoing) any overhead for common employees, shared office space or other overhead and administrative expenses;

(r)     if Borrower at any time has employees, allow any Person to pay the salaries of Borrower's employees;

(s)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(t)     file a voluntary petition or otherwise initiate proceedings to have Borrower or General Partner adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against Borrower or General Partner, or file a petition seeking or consenting to reorganization or relief of Borrower or General Partner as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to Borrower or General Partner; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequester, custodian, liquidator (or other similar official) of Borrower or General Partner or of all or any substantial part of the properties and assets of Borrower or General Partner, or make any general assignment for the benefit of creditors of Borrower or General Partner, or admit in writing the inability of Borrower or General Partner to pay its debts generally as they become due or declare or effect a moratorium on the payment of any Indebtedness of Borrower or General Partner or take any action in furtherance of any such action; or

(u)     conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of Borrower or the creditors of any other Person.

8.11     <u>Additional Banking Laws</u>.  Borrower shall (a) ensure, and cause each Affiliate to ensure, that no person who owns a controlling interest in or otherwise controls Borrower or any Affiliate is or shall be listed on the "Specially Designated Nationals and Blocked Person List" or other similar lists maintained by the Office of Foreign Assets Control ("<u>OFAC</u>"), the Department of the Treasury, or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause each Affiliate to comply, with all applicable bank secrecy act laws and regulations, as amended.

8.12     <u>Tax Shelter Disclosure</u>.  None of Borrower, Guarantor, or any Affiliate or subsidiary of any of the foregoing intends to treat the Loan or the transactions contemplated by this Agreement and the other Loan Documents as being a "reportable transaction" (within the meaning of Regulation Section 1.6011-4).  If Borrower, or any other party determines to take any action inconsistent with such intention, Borrower shall promptly notify Lender thereof in writing.  If Borrower so notifies Lender, Borrower acknowledges that Lender may treat the Loan as part of a transaction that is subject to Regulation Section

301.6112-1, and Lender will maintain the lists and other records, including the identity of the applicable party to the Loan as required by such Regulation.

8.13    Taxes.

(a)    Borrower's Obligation for Payment of Taxes.  Subject to the right to contest under Section 8.13(b), Borrower shall pay or cause to be paid all Taxes when due and payable, and before any penalty attaches, except to the extent Lender makes payment of any such Taxes from the deposits made under Section 8.14 hereof.  Borrower shall deliver promptly to Lender receipts or other reasonable evidence evidencing such payment (and such evidence shall be furnished no later than the date that Taxes would otherwise be delinquent).  Borrower shall not suffer, permit, initiate, or otherwise cause for any purpose, the joint assessment of (i) the Property with any other real property, or (ii) the Property and the Personal Property, or any other procedure whereby the lien of real property taxes and assessments and the lien of personal property taxes shall be assessed, levied or charged against the Land as a single lien.  While any Obligations remain outstanding, the Property shall be segregated on the applicable tax rolls from all other property, both real and personal.  Borrower's obligations under this Section 8.13 shall not be affected by any damage to, defects in or destruction of the Property or any other event, including obsolescence of all or any part of the Property.

(b)    Contest of Taxes.  Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes, provided that (i) no Default or Event of Default has occurred and is continuing; (ii) such proceeding shall suspend the collection of the applicable Taxes from Borrower and from the Property or Borrower shall have paid all of the applicable Taxes under protest, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost so long as the contest is being pursued, and (v) Borrower shall have deposited with Lender adequate reserves for the payment of the applicable Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the applicable Taxes under protest, or Borrower shall have furnished such other security as may be accepted by Lender in its reasonable discretion to insure the payment of any contested Taxes, together with all interest and penalties thereon; and (vi) Borrower gives Lender prompt notice of any such contest.  Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

(c)    Effect of Change in Law.  If at any time any law is enacted which deducts from the value of real property, for taxation purposes, any lien thereon, or changes in any way the laws now in force for the taxation of mortgages, deeds of trust or debts secured thereby, or the manner of collection of any such taxes so as to affect any interest of Lender hereunder then Borrower shall pay such tax if it may lawfully do so.  If Borrower is not permitted by Applicable Law to pay such tax, or if Borrower is not permitted by Applicable Law to immediately reimburse Lender for any such payment, then the Obligations, at the option of Lender, upon not less than the lesser of (i) ninety (90) days written notice, or (ii) such shorter period as may be required to ensure compliance by Lender with Applicable Law, shall become due and payable.

(d)    Change in Tax Laws.  If, by the laws of the United States of America, or of any state or municipality having jurisdiction over Lender, Borrower or the Property, any tax is imposed or becomes due in respect of the Note or the Security Instrument (excluding income, excise or franchise taxes imposed upon Lender, except as levied against the income of Lender as

a complete or partial substitute for Taxes to be paid by Borrower hereunder), or any liens on the Property created thereby, then Borrower shall pay such tax in the manner required by such law.

8.14   <u>Escrow Deposits</u>.  Upon Lender's request after and during the continuance of an Event of Default, Lender may require that Borrower pay to Lender on the first Business Day of each calendar month an amount equal to one-twelfth (1/12th) of what Lender estimates is necessary to pay, on an annualized basis, (1) all Taxes, and (2) all premiums for the Policies (the "<u>Premiums</u>") required under <u>Section 10.1</u> hereof and to enable Lender to pay same at least thirty (30) days before the Taxes would become delinquent and the Premiums are due, and, on demand, from time to time shall pay to Lender additional sums necessary to pay the Premiums and Taxes.  No amounts so paid shall be deemed to be trust funds, but may be commingled with the general funds of Lender, and no interest shall be payable thereon.  In the event that Borrower does not pay such sums for Premiums and Taxes, then Lender may, but shall not be obligated to, pay such Premiums and Taxes and any money so paid by Lender shall constitute additional Obligations hereunder and shall be payable by Borrower to Lender on demand with interest thereon from the date of disbursement by Lender at Default Rate until repaid to Lender.  If an Event of Default occurs, Lender shall have the right, at its election, to apply any amounts so held under this <u>Section 8.14</u> against all or any part of the Obligations, or in payment of the Premiums or Taxes for which the amounts were deposited.  Borrower will furnish to Lender bills for Taxes and Premiums not less than thirty (30) days before Taxes become delinquent and such Premiums become due.

8.15   <u>Certificate of Beneficial Ownership</u>.  Borrower shall provide to Lender:  (i) confirmation of the accuracy of the information set forth in the most recent Certificate of Beneficial Ownership provided to Lender; (ii) a new Certificate of Beneficial Ownership, in form and substance acceptable to Lender, when any individual identified as a Beneficial Owner has changed; and (iii) such other information and documentation as may reasonably be requested by Lender from time to time for purposes of compliance by Lender with the Beneficial Ownership Regulation and any other applicable laws (including without limitation the Patriot Act and other "know your customer" and anti-money laundering rules and regulations), and any policy or procedure implemented by Lender to comply therewith.

9.   **OTHER NEGATIVE COVENANTS**.  While any Obligation of Borrower or Guarantor under the Loan Documents remains outstanding, the following provisions shall apply, except to the extent that Lender otherwise consents in writing:

9.1   <u>Liens on Property</u>.  Except as otherwise provided in this Agreement or in the Security Instrument, Borrower shall not cause or suffer to become effective any lien, restriction or other title limitation affecting any part of the Property other than (i) the Security Instrument, the Assignment of Leases and the Permitted Encumbrances, and (ii) real estate and Personal Property taxes and assessments not delinquent.  Borrower shall provide to Lender written evidence of the payment of all real estate and Personal Property taxes on or before such taxes become delinquent.

9.2   <u>Liens on Personal Property</u>.  Borrower shall not install in, or use in connection with, the Property any Personal Property which any Person other than Lender has the right to remove or repossess under any circumstances, or on which any Person other than Lender has a lien.

9.3   <u>Removal of Personal Property</u>.  Borrower shall not cause or permit the removal from the Property of any items of Personal Property (other than tools and equipment used in the development of the Project) unless (a) no Default or Event of Default has occurred and is continuing, and (b) Borrower promptly substitutes and installs on the Property other items of equal or greater value in the operation of the Property, all of which items shall be free of liens (other than liens in favor of Lender or such other Person as Lender shall permit in writing) and shall be subject to the lien of the Security Instrument, and executes and delivers to Lender all documents required by Lender in connection with the attachment of such liens to such items.  Borrower shall keep records of each such removal and shall make such records available to Lender upon written request from time to time.

44

9.4     Borrower Organizational Documents.  None of the Borrower Entity Documents shall be amended, supplemented, modified, or restated, in whole or in part, without the prior, written consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed); provided that no such consent shall be required for amendments to the Partnership Agreement of Borrower executed and delivered exclusively to memorialize a Permitted Transfer so long as any required notice is provided to Lender.  Borrower shall deliver to Lender a copy of any amendment to the Partnership Agreement or the Certificate of Limited Partnership of Borrower within ten (10) days after the execution of any such amendment, regardless of whether such amendment requires the prior written consent of Lender.  Except in connection with a Permitted Transfer, no Partner of Borrower shall be released or discharged from its, his or her obligations under Borrower's Partnership Agreement, nor shall any Partner of Borrower transfer, pledge or encumber in any way any interest in Borrower or the right to receive income or proceeds from Borrower.

9.5     Management Agreement.  Without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, Borrower shall not enter into any agreement providing for the management, leasing or operation of any portion of the Property other than the Property Management Agreement.

9.6     Project Agreements.  Except as expressly permitted under this Agreement or any other Loan Document, Borrower shall not enter into any new Project Agreement, or amend, modify, supplement, cancel or terminate any Project Agreement, without the prior written consent of Lender.  Notwithstanding the foregoing, Lender's consent shall not be required for amendments to the Holdings LPA other than (i) the addition of one or more Removal Events and/or (ii) a reduction in the maturity date of the preferred equity. Borrower shall notify Lender in writing upon any amendment to the Holdings LPA resulting in the deletion of one or more Removal Events.

9.7     Limitations on Additional Indebtedness; Other Prohibited Transactions.

(a)     Except as expressly permitted herein, Borrower shall not, without the prior written consent of Lender granted in its sole discretion, incur any Indebtedness of any kind.

(b)     Borrower shall not, without the prior written consent of Lender, engage directly or indirectly in any off balance sheet, hedge or derivative transactions, including without limitation, interest rate swaps and interest rate caps except with Lender and its Affiliates and subsidiaries.  In addition to the foregoing, Borrower shall not cause or allow the proceeds of the Loan to be invested.

9.8     Distributions.  Borrower shall not make any distributions of cash or property to its Partners or otherwise on account of the equity interest in Borrower, whether or not such a distribution is permitted or required under the terms of Borrower's Partnership Agreement, including without limitation, the repayment of any loans made by a Partner to Borrower, the return of capital contributions, or distributions upon termination, liquidation, or dissolution of Borrower (in each case, a "Distribution").  Notwithstanding the foregoing, Distributions of Operating Cash Flow shall be permitted if (i) no uncured Default for which Lender has provided Borrower written notice or Event of Default then exists; (ii) such Distributions would not cause the Loan to be classified as an HVCRE ADC transaction as determined by Lender; and (iii) at the time of Distribution, the Property has a Debt Service Coverage Ratio of no less than 1.00 to 1.00 for no less than the two (2) previous Quarters.

9.9     Guarantor Financial Covenants.  Borrower shall not permit the violation by Guarantor of any of the Guarantor Financial Covenants. As used herein, "Guarantor Financial Covenants" means the requirement that, at all times until the Loan is repaid in full, Guarantor maintains Liquid Assets having a value of (i) not less than $5,000,000.00 for the period from the Closing Date until the Construction Completion Date, (ii) not less than $4,500,000.00 upon Borrower maintaining, after the Construction

Completion Date, a Debt Service Coverage Ratio of no less than 1.10 to 1.00 on a trailing six (6)-month basis, annualized, and (iii) not less than $3,000,000.00 upon Borrower maintaining, after the Construction Completion Date, a Debt Service Coverage Ratio of no less than 1.20 to 1.00 on a trailing six (6)-month basis, annualized.

9.10    <u>Debt Service Coverage Ratio</u>.  Commencing on the date that is thirty-six (36) months after the Closing Date, (i) Borrower must maintain a Debt Service Coverage Ratio at any time of 0.75 to 1.00 or greater (the "1st <u>DSCR Test</u>"), and (ii) the overall average rental rates at any time for Leases in place shall be at or above proforma rentals (the "1st <u>Rent Test</u>"), which Debt Service Coverage Ratio and average rental rates shall be calculated quarterly as of the end of each Quarter on a trailing three (3)-month basis, annualized.  Commencing on the date that is forty-two (42) months after the Closing Date, (i) Borrower must maintain a Debt Service Coverage Ratio at any time of 1.00 to 1.00 or greater (the "2nd <u>DSCR Test</u>"), and (ii) the overall average rental rates at any time for Leases in place shall be at or above proforma rentals (the "2nd <u>Rent Test</u>"), which Debt Service Coverage Ratio and average rental rates shall be calculated quarterly as of the end of each Quarter on a trailing six (6)-month basis, annualized.  Commencing on the date that is forty-eight (48) months after the Closing Date, Borrower must maintain a Debt Service Coverage Ratio at any time of 1.20 to 1.00 or greater, which Debt Service Coverage Ratio shall be calculated semiannually on a trailing twelve (12)-month basis, annualized (the "3rd <u>DSCR Test</u>").  As used herein, "proforma rentals" means the appraiser's un-trended rental rates for the Project as reflected in the Appraisal dated March 9, 2022, prepared by Bruce Bailey of CBRE, Inc.

10.    **<u>INSURANCE, CASUALTY AND CONDEMNATION</u>**.

10.1    <u>Insurance Coverage</u>.  For so long as the Security Instrument is in effect, Borrower shall continuously maintain insurance in accordance with the following provisions:

(a)    At its own cost, Borrower shall either maintain or cause to be maintained at all times during the term of the Loan the Policies required by Lender pursuant to **<u>Exhibit I</u>** attached hereto.  Borrower shall provide Lender with evidence of all such insurance required hereunder.

(b)    The Policies to be obtained and maintained by Borrower under the provisions of this Agreement shall be issued by responsible insurance carriers with an A.M. Best's rating of no less than A-/VII, licensed to do business in the State wherein the Property or Project is situated, who are reasonably acceptable to Lender and shall be in such form and with such endorsements, waivers and deductibles (in no event to exceed all risk property deductible of $100,000 per occurrence and commercially reasonable deductibles for water damage and, if applicable, named windstorm, flood and earthquake) as Lender shall designate or reasonably approve.  Without limitation on the foregoing:

(i)    All Policies shall name Borrower as a Named Insured.  The property policies shall each list Lender as mortgagee, lender's loss payable (under a standard non-contributing mortgagee protection clause, in form reasonably satisfactory to Lender, attached to such Policy or Policies whenever applicable, and providing, among other matters, that all Insurance Proceeds (as hereinafter defined) shall be paid to Lender).  The liability insurance Policies shall list Lender as an Additional Insured.

(ii)    All Policies shall contain:  (1) the agreement of the insurer to give Lender at least thirty (30) days' written notice (ten (10) days' written notice for non-payment) prior to cancellation or expiration or change in such Policies, or any of them; (2) a waiver of subrogation rights against Lender and, if available Borrower; (3) an agreement that such Policies are primary and non-contributing with any insurance that may be carried by Lender; (4) a statement that the insurance shall not be invalidated should any insured waive, prior to a loss, any or all right of recovery against any party for loss

accruing to the property described in the Policy; and (5) if obtainable, a provision that no act or omission of Borrower shall affect or limit the obligation of the insurance carrier to pay the amount of any loss sustained.  As of the date hereof, and subject to any changes in such requirements which Lender may, in its discretion, make from time to time pursuant to its rights under this <u>Section 10.1</u>, each Policy of property insurance hereunder shall contain a lender's loss payable endorsement, lender clause, or other non-contributory mortgagee clause of similar form and substance acceptable to Lender in favor of Lender as a mortgagee.

(c)      Concurrently herewith, Borrower shall deliver to Lender evidence of such coverage via certificates of insurance with evidence of insurance Premiums paid evidencing the insurance required hereunder at Lender's reasonable sole discretion.  Borrower shall procure and pay for renewals of such insurance (or shall cause the procurement and payment) from time to time before the expiration thereof, and Borrower shall deliver to Lender such renewal certificates of insurance with evidence of Premiums paid at or upon the expiration of any existing Policy.

(d)      Borrower may carry additional, separate insurance concurrent in kind or form or contributing upon loss, with any required insurance Policies, but only if the additional, separate insurance:

(i)      does not violate any required insurance, or entitle the carrier to asset any defense or disclaim any primary coverage under any required insurance;

(ii)      mutually benefits Borrower and Lender; and

(iii)      otherwise complies with this Agreement.

(e)      Borrower, for itself, and on behalf of its insurers, hereby releases and waives any right to recover against Lender on any liability for:  damages for injury to or death of persons; any loss or damage to property, including the property of any occupant of the Property; any loss or damage to buildings or other improvements comprising the Property; any other direct or indirect loss or damage caused by fire or other risks, which loss or damage is or would be covered by the insurance required to be carried hereunder by Borrower, or is otherwise insured; or claims arising by reason of any of the foregoing, except to the extent caused solely by the gross negligence or willful misconduct of Lender or caused by events occurring after Lender takes title to the Property through a foreclosure or conveyance in lieu of foreclosure or a receiver is appointed at Lender's request over the Property.

(f)      Lender shall not, by reason of accepting, rejecting, obtaining or failing to obtain insurance, incur any liability for (i) the existence, non-existence, form, amount or legal sufficiency thereof, (ii) the solvency or insolvency of any insurer, or (iii) the payment of losses. All insurance required hereunder or carried by Borrower shall be procured at Borrower's sole cost and expense.  Borrower shall deliver to Lender receipts satisfactory to Lender evidencing full payment of the Premiums therefor, except to the extent Lender makes payments with Borrower's deposits under <u>Section 8.14</u> hereof (for the periods and payments so covered by such payments). In the event of foreclosure on, or other transfer of title in lieu of foreclosure of, the Property, all of Borrower's interest in and to any and all Policies in force shall pass to Lender, or the transferee or purchaser as the case may be, and Lender is hereby irrevocably authorized to assign in Borrower's name to such purchaser or transferee all such Policies, which may be amended or rewritten to show the interest of such purchaser or transferee.

(g)      <u>Texas Finance Code Section 307.052 Collateral Protection Insurance Notice</u>. (A) BORROWER IS REQUIRED TO: (I) KEEP THE PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (II) PURCHASE THE INSURANCE

FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS; (B) BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A CERTIFICATE EVIDENCING SUCH INSURANCE AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN SUBSECTION (A) OR (B), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT BORROWER'S EXPENSE.

(h)     If Borrower fails to procure, pay the Premiums for, or deliver to Lender any of the Policies or renewals as required herein, Lender may elect, but shall not be obligated, to obtain such insurance and pay the Premiums therefor.  Borrower shall pay to Lender on demand any Premiums so paid with interest thereon at the Default Rate set forth in the Note, from the time of the advance for such payment by Lender, until paid to Lender, and said advance and interest shall be part of the Obligations.

(i)     Lender reserves the right to require additional insurance Policies not specifically addressed in this Agreement during the term of the Loan (y) to the extent required by regulatory agencies having authority over Lender or (z) to cover risks initially covered but that become excluded due to modifications to the Policies.

(j)     The Policies set forth on **Exhibit I** shall be standard ISO coverage forms. Manuscripted coverage forms may be deemed acceptable following satisfactory review by Lender's insurance advisors.

(k)     Approval by Lender of any Policies shall not be deemed a representation by Lender as to the adequacy of coverage of such Policies or the solvency of the insurer.

10.2    Casualty Loss; Proceeds of Insurance.

(a)     Borrower will give Lender prompt written notice of any loss or damage to the Property, or any part thereof, by fire or other casualty.

(b)     In case of loss or damage covered by any one of the property insurance Policies in excess of $500,000.00 (the "Insurance Threshold"), both Lender and Borrower are hereby authorized to settle and adjust any claim under such property insurance Policies (and after the entry of a decree of foreclosure, or a sale or transfer pursuant thereto or in lieu thereof, the decree creditor or such purchaser or transferee, as the case may be, are hereby authorized to settle and adjust any claim under such Policies) upon consultation with and consent from, the Borrower or Lender, as applicable; and the Borrower or Lender shall, as applicable, and is hereby authorized to, collect and receipt for any and all proceeds payable under such property insurance Policies in connection with any such loss (collectively, the "Insurance Proceeds").  Borrower hereby irrevocably appoints Lender as its attorney-in-fact for the purposes set forth in the preceding sentence.  Each property insurance company is hereby authorized and directed to make payment (i) of 100% of all such losses (if such loss exceeds the Insurance Threshold) directly to Lender alone, and (ii) of 100% of all such losses (if such loss is less than or equal to the Insurance Threshold) directly to Borrower alone, and in no case to Borrower and Lender jointly.  All reasonable costs and expenses incurred by Lender in the adjustment and collection of any such Insurance Proceeds (including without limitation reasonable attorneys' fees and expenses) shall be additional Obligations, and shall be reimbursed to Lender upon demand or may be paid and deducted by Lender from such Insurance Proceeds prior to any other application thereof.  Lender shall not be responsible for any failure to collect any Insurance Proceeds due under the terms of any Policy regardless of the cause of such failure, other than the gross negligence or willful

misconduct of Lender or caused by events occurring after Lender takes title to the Property through a foreclosure or conveyance in lieu of foreclosure or a receiver is appointed at Lender's request over the Property.

(c)    Insurance Proceeds received by Lender under the provisions of this Agreement or any instrument supplemental hereto or thereto or any Policy or Policies covering any Improvements or any part thereof shall be applied by Lender at its option as and for a prepayment on the Note, without a prepayment fee (whether or not the same is then due or otherwise adequately secured), or shall be disbursed for restoration of such Improvements ("Restoration"), in which event Lender shall not be obligated to supervise Restoration work nor shall the amount so released or used be deemed a payment of the Obligations evidenced by the Note.  If Lender elects to permit the use of Insurance Proceeds to restore such Improvements it may do all necessary acts to accomplish that purpose, including advancing additional funds and all such additional funds shall constitute part of the Obligations.  If Lender elects to make the Insurance Proceeds available to Borrower for the purpose of effecting the Restoration, or, following an Event of Default, elects to restore such Improvements, any excess of Insurance Proceeds above the amount necessary to complete the Restoration shall be applied as and for a prepayment on the Note, without a prepayment fee or premium.  No interest shall be payable to Borrower upon Insurance Proceeds held by Lender.

(d)    Notwithstanding the provisions of Section 10.2(c) above, provided such loss is less than the Insurance Threshold, Lender agrees to allow the Insurance Proceeds to be disbursed for Restoration provided: (i) no Default for which Lender has provided written notice has occurred and is continuing and no Event of Default shall have occurred and be continuing; (ii) Lender shall be satisfied in its reasonable discretion, that by expenditure of the Insurance Proceeds hereunder the Property damaged or destroyed shall be fully restored within a reasonable period of time to the condition and value contemplated by this Agreement and the Restoration Plans (as hereinafter defined), and all payments required under the Loan will continue to be paid as and when the same become due and payable; (iii) in Lender's good faith judgment, such work of repair and Restoration can be completed in the ordinary course of business not later than the earlier of (A) six (6) months prior to the Maturity Date; or (B) the outside date, if any, under any Lease or under any federal, state, county, municipal or other governmental statute, law, rule, order, regulation, ordinance, judgment, decree or injunction or any Permit, license, covenant, agreement, restoration or encumbrance; (iv) Lender shall have reviewed and approved (such approval not to be unreasonably withheld, conditioned or delayed) Borrower's plans and specifications for the repair and Restoration of the Property involving costs in excess of $500,000.00 (collectively, the "Restoration Plans"), Borrower's architect and any general contractors, subcontractors and material suppliers employed to perform such work; (v) if so required by Lender in its sole and absolute discretion, all general contractors, all major subcontractors and material suppliers shall have supplied 100% performance and completion bonds; (vi) if the net Insurance Proceeds available are insufficient for payment of the full cost of Restoration or repair and the payments under the Loan during the completion period, as estimated by Lender, then Borrower shall have deposited with Lender sufficient additional funds to insure payment of all such costs, or made arrangements acceptable to Lender for such sufficient additional funds; (vii) rent loss or business interruption insurance is available to cover the full amount of any loss of income from the Property during its repair and Restoration; and (viii) Borrower shall provide evidence of the implementation of builder's risk coverage for the Property with coverage and in such amounts as Lender shall request and which otherwise complies with the insurance requirements set forth in Section 10.1 hereof.

(e)    So long as any Obligations shall be outstanding and unpaid, and whether or not Insurance Proceeds are available or sufficient therefor, Borrower shall promptly commence and complete, or cause to be commenced and completed, with all reasonable diligence, the Restoration

of the Property as nearly as possible to the same value, condition and character which existed immediately prior to such loss or damage in accordance with the Restoration Plans and in compliance with all legal requirements and if applicable, the requirements of all Leases.  Any Restoration shall be effected in accordance with procedures to be first submitted to and approved by Lender in accordance with Section 10.4 hereof.  Borrower shall pay all costs of such Restoration to the extent Insurance Proceeds are not made available or are insufficient.

10.3    Condemnation and Eminent Domain.

(a)    Any and all awards (the "Awards")  in excess of $500,000 heretofore or hereafter made or to be made to Borrower (or any subsequent owner of the Property, or any part thereof) by any governmental or other lawful authority for the taking, by condemnation or eminent domain, of all or any part of the Property (including any award from the United States government at any time after the allowance of a claim therefor, the ascertainment of the amount thereto, and the issuance of a warrant for payment thereof), are hereby assigned by Borrower to Lender, which Awards Lender is hereby authorized to collect and receive from the condemnation authorities, and Lender is hereby authorized to appear in and prosecute, in the name of and on behalf of Borrower, any action or proceeding to enforce any such cause of action in which an award in excess of $500,000 is sought and to make any compromise or settlement in connection therewith and to give appropriate receipts and acquittance therefor in the name and in behalf of Borrower. Borrower shall give Lender immediate notice of the actual or threatened commencement of any condemnation or eminent domain proceedings affecting all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with any such proceedings. All reasonable costs and expenses incurred by Lender in the adjustment and collection of any such Awards (including without limitation reasonable attorneys' fees and expenses) shall be additional Obligations, and shall be reimbursed with interest thereon to Lender from any Award prior to any other application thereof.  Borrower further agrees to make, execute and deliver to Lender, at any time upon request, free, clear, and discharged of any encumbrance of any kind whatsoever (other than Permitted Encumbrances), any and all further assignments and other instruments deemed necessary by Lender for the purpose of validly and sufficiently assigning all Awards in excess of $500,000 and other compensation heretofore and hereafter made to Borrower for any permanent taking, under any such proceeding.

(b)    Subject to subsection (c) below, the proceeds of any Award received by Lender under the provisions of this Agreement or any instrument supplemental hereto shall be applied by Lender at its option as and for a prepayment of the Obligations, without a prepayment fee (whether or not the same is then due or otherwise adequately secured), or shall be disbursed for Restoration of the Property or any portion thereof, in which event Lender shall not be obligated to supervise Restoration work nor shall the amount so released or used be deemed a payment of the Obligations.  If Lender elects to permit the use of the proceeds of an Award to restore the Property or any portion thereof, it may do all necessary acts to accomplish that purpose, including advancing additional funds, all such additional funds to constitute part of the Obligations.  If Lender elects to make the proceeds of an Award available to Borrower for the purpose of effecting the Restoration, or, following an Event of Default, elects to restore such Improvements, any excess of such proceeds above the amount necessary to complete the Restoration shall be applied as and for a prepayment of the Obligations, without a prepayment fee or premium.  No interest shall be payable to Borrower upon such proceeds held by Lender.

(c)    Notwithstanding the provisions of Section 10.3(b) above, Lender agrees to allow the Award to be disbursed for Restoration provided: (i) all conditions to the use of casualty proceeds under Section 10.2(d) have been satisfied, and (ii) the condemnation, in the reasonable judgment of Lender, shall have no material adverse effect on the operation or value of the Property

50

remaining after the condemnation is completed, and (iii) Borrower shall have satisfied such other conditions as Lender may in good faith determine to be appropriate.

(d)  So long as any Obligations shall be outstanding and unpaid, and whether or not Awards are available or sufficient therefor, Borrower shall promptly commence and complete, or cause to be commenced and completed, with all reasonable diligence the Restoration of the portion of the Property not so taken as nearly as possible to the same value, condition and character, which existed immediately prior to such taking in compliance with all legal requirements.  Any Restoration of the Property involving costs in excess of $500,000 shall be effected in accordance with Restoration Plans to be first submitted to and approved by Lender as provided in Section 10.4 hereof.  Borrower shall pay all costs of such Restoration to the extent the Award is not made available or is insufficient.

10.4    Disbursement of Insurance Proceeds and Awards.

(a)  All Insurance Proceeds and/or Awards received by Lender as provided in Section 10.2 or Section 10.3 hereof shall, after payment or reimbursement therefrom of all reasonable costs and expenses (including without limitation reasonable attorneys' fees and expenses) incurred  by Lender in the adjustment and collection thereof (collectively, the "Net Insurance Proceeds"), shall be deposited with Lender, or such other depositary as may be designated by Lender, and applied as provided in this Section.

(b)  Subject to Section 10.4(c) hereinbelow, Lender may elect to apply the Net Insurance Proceeds to prepayment of the Obligations, whether then due or not.  If the Obligations are not prepaid in full, then the Net Insurance Proceeds shall be applied to the installments of principal and interest in the inverse order of maturity.

(c)  All Net Insurance Proceeds which are not applied to the payment of the Obligations shall be applied to fund the payment of the costs, fees and expenses incurred for the Restoration of the Property as required under Section 10.2 or Section 10.3 hereof and such Net Insurance Proceeds shall be disbursed through the title company which has insured the lien of this Agreement to complete the Restoration; provided that Lender shall receive the following:

(i)  Restoration Plans (unless the costs involved in such Restoration shall not exceed $500,000), which shall be subject to the reasonable approval of Lender prior to the commencement of the Restoration.

(ii)  Such architect's and engineer's certificates, contractor's sworn statements, payment and performance bonds (if applicable), title insurance endorsements, plats of survey, opinions of counsel and such other evidences of cost, payment and performance as Lender may reasonably require and approve.

(d)  If Borrower shall fail to commence Restoration within thirty (30) days after the settlement of the claim involving loss or damage to the Property, and diligently proceed to complete Restoration in accordance with the Restoration Plans and all laws, statutes, ordinances, rules, regulations, judgments, decrees or orders of any Governmental Authority which are applicable to Borrower or the Property, or if any other Event of Default shall occur hereunder at any time (whether before or after the commencement of such Restoration), all or any portion of the Obligations may be declared to be immediately due and payable and such Net Insurance Proceeds, or any portion thereof, then held, or subsequently received, by Lender or other depositary hereunder may be applied, at the option and in the sole discretion of Lender, to the payment or prepayment of the Obligations in whole or in part, or to the payment and performance of such obligations of Borrower as may then be in default hereunder.

(e)    Any surplus which may remain out of such Net Insurance Proceeds after payment of all costs, fees and expenses of such Restoration shall be applied to prepayment of the Obligations, without the payment of a prepayment fee or prepayment premium.

11.    **DEFAULTS AND REMEDIES**.

11.1    <u>Events of Default</u>.  The occurrence of any one or more of the following shall constitute an "<u>Event of Default</u>" as said term is used herein, and any Event of Default which may occur hereunder shall constitute an Event of Default under each of the other Loan Documents:

(a)    Borrower fails to pay (i) any installment of principal or interest payable pursuant to the terms of the Note within five (5) days of the date when due, or (ii) any other amount payable to Lender under the Note, this Agreement, the Security Instrument or any of the other Loan Documents within five (5) days after the date Borrower receives written notice from Lender of the failure to make such payment when due in accordance with the terms hereof or thereof; or

(b)    Borrower fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower under the Note, this Agreement, the Security Instrument or any of the other Loan Documents and not specifically described in this <u>Section 11.1</u> or in the Default section of any other Loan Document; provided, however, that if such failure by its nature can be cured, then so long as the continued operation, safety and value of the Property, and the priority, validity and enforceability of the liens created by the Security Instrument or any of the other Loan Documents, are not impaired, threatened or jeopardized, then Borrower shall have a period (the "<u>Cure Period</u>") of thirty (30) days after Borrower obtains actual knowledge of such failure or receives written notice of such failure to cure the same and an Event of Default shall not be deemed to exist during the Cure Period; provided further that if such failure by its nature can be cured but cannot be cured by the payment of money and Borrower commences to cure such failure during the Cure Period and is diligently and in good faith attempting to effect such cure, the Cure Period shall be extended for thirty (30) additional days, but in no event shall the Cure Period be longer than sixty (60) days in the aggregate; or

(c)    The existence of any inaccuracy or untruth in any material respect in any certification, representation or warranty contained in this Agreement or any of the other Loan Documents or of any statement or certification as to facts delivered to Lender by Borrower, General Partner or Guarantor, provided, however, that if such inaccuracy or untruth by its nature can be cured, then so long as the continued operation, safety and value of the Property, and the priority, validity and enforceability of the liens created by the Security Instrument or any of the other Security Documents, are not impaired, threatened or jeopardized, then Borrower shall have the Cure Period (as it may be extended to sixty (60) days pursuant to <u>Section 11.1(b)</u> to cure such inaccuracy or untruth); or

(d)    Borrower, General Partner or Guarantor is dissolved, liquidated or terminated, or all or substantially all of the assets of Borrower, General Partner or Guarantor are sold or otherwise transferred without Lender's prior written consent; or

(e)    Borrower, General Partner or Guarantor is the subject of an order for relief by a bankruptcy court, or is unable or admits its inability (whether through repudiation or otherwise) to pay its debts as they mature, or makes an assignment for the benefit of creditors; or Borrower, General Partner or Guarantor applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or any part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of Borrower, General Partner or Guarantor, as the

52

case may be, and the appointment continues undischarged or unstayed for sixty (60) days; or Borrower, General Partner or Guarantor institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of Indebtedness, dissolution, custodianship, conservatorship, liquidation, construction or similar proceeding relating to it or any part of its property; or any similar proceeding is instituted without the consent of Borrower, General Partner or Guarantor, as the case may be, and continues undismissed or unstayed for sixty (60) days; or any judgment, writ, warrant of attachment or execution, or similar process is issued or levied against any property of Borrower, General Partner or Guarantor and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(f)        Any Guaranty is repudiated, revoked or terminated in whole or in part without Lender's prior written consent; or Guarantor claims that his, her or its Guaranty is ineffective or unenforceable, in whole or in part and for any reason, with respect to amounts then outstanding or amounts that might in the future be outstanding (provided no Event of Default shall occur solely due to a Guarantor contesting in good faith whether or not an Event of Default exists); or

(g)        Guarantor (if a natural person) dies, unless, within sixty (60) days after Guarantor's death, the estate of the deceased Guarantor or another substitute guarantor approved by Lender in Lender's sole discretion shall have assumed all of Guarantor's obligations under Guarantor's Guaranty pursuant to a written assumption agreement duly authorized, executed and delivered by such assuming guarantor to Lender and otherwise in form and substance acceptable to Lender; or

(h)        The occurrence of any other Prohibited Transfer (as defined in the Security Instrument);

(i)        At Lender's option in its sole and absolute discretion, the institution of foreclosure proceedings that are not dismissed within thirty (30) days with respect to any Mechanic's Lien (as such term is defined in the Security Instrument) or any other lien secured by an interest in the Property;

(j)        The withdrawal, removal or substitution of General Partner under the Partnership Agreement or Investor GP under the Holdings LPA (except in connection with a Permitted Transfer); or

(k)        Lender or the Lender Consultant shall determine, after consultation with Borrower, that any construction work theretofore completed is not in material compliance with the Plans, and Borrower shall fail to commence correction of the same to the satisfaction of Lender within thirty (30) days after written notice of such determination and thereafter diligently complete the same; or

(l)        (i) Unless caused by a Force Majeure Event, a discontinuance or abandonment of construction for a period of thirty (30) days, unless caused by a Force Majeure Event, a material failure to adhere to the Construction Schedule; or (ii) Construction Completion is not, or in Lender's reasonable judgment will not be, achieved on or before the earlier of (1) the earliest date required under any Project Agreement, or (2) the Construction Completion Date; or

(m)       Borrower is enjoined or otherwise prohibited by any Governmental Authority from constructing and/or occupying the Improvements and such injunction or prohibition continues unstayed for sixty (60) days or more for any reason; or

(n)        The bankruptcy or insolvency of the General Contractor, or the material breach by General Contractor of the General Contract (unless the General Contractor is still performing its material duties under the General Contract) and the failure of Borrower to procure a

replacement General Contractor satisfactory to Lender within sixty (60) days from the occurrence of such bankruptcy, insolvency or breach; or

(o)    Any material provision of this Agreement or the other Loan Documents shall at any time for any reason cease to be valid and binding on Borrower, or shall be declared to be null and void, or the validity or enforceability thereof shall be successfully contested by any Governmental Authority, or Borrower shall deny that it has any or further liability or obligation under this Agreement or the other Loan Documents; or

(p)    Any default by Borrower or Guarantor in any payment of principal or interest due and owing upon any other obligations of Borrower for borrowed money beyond any period of grace provided with respect thereto or in the performance of any other agreement, term or condition contained in any agreement under which such obligation is created, if the effect of such default is to accelerate the maturity of such Indebtedness or to permit the holder thereof to cause such Indebtedness to become due prior to its stated maturity; or

(q)    Guarantor fails to perform any obligation (following any applicable notice and cure period) required to be performed by Guarantor under the Guaranty; or

(r)    All or any material portion of the Property is condemned, seized or appropriated by a Governmental Authority; or

(s)    The Property is materially damaged or destroyed by fire or other casualty unless Borrower establishes within sixty (60) days after such casualty its qualification under Section 10.2(d) of this Agreement to use any available Insurance Proceeds to restore the Property and thereafter diligently restores the Property in accordance with this Agreement and the Security Instrument; or

(t)    The existence of any fraud, dishonesty or bad faith by or with the acquiescence of Borrower, General Partner or Guarantor which in any way relates to or affects the Loan or the Property; or

(u)    Failure by Borrower to deposit with Lender funds required to maintain the Loan In Balance within the time and in the manner herein required; or

(v)    The occurrence of any event specifically identified as an Event of Default in any other section of this Agreement or in any other Loan Document; or

(w)    The occurrence of a Material Adverse Change in the financial condition of Borrower, General Partner or Guarantor which Lender reasonably determines could materially and adversely affect the ability of such person to perform its obligations under this Agreement or the Loan Documents; or

(x)    Either Borrower, General Partner or Guarantor shall have a judgment entered against it, him or her in excess of One Hundred Thousand Dollars ($100,000.00) (and as to Guarantor, as a result of such judgment, Guarantor no longer meets the financial covenants set forth in the Guaranty) in any civil, administrative or other proceeding, which judgment is not fully covered by insurance, and such judgment remains unpaid, unvacated, unbonded or unstayed by appeal or otherwise for a period of thirty (30) days from the date of its entry; or

(y)    The termination of the General Contract, the Architect's Contract or the Engineer's Contract without Lender's prior written consent; or

(z)      Failure to comply with the conditions set forth in <u>Section 4.11</u> within sixty (60) days after the Construction Completion Date; or

(aa)      The occurrence of a default under any Rate Management Agreement; or

(bb)      Except as expressly permitted under this Agreement or any other Loan Document, any material modification or amendment of, or termination of, the General Contract, the Architect's Contract or the Engineer's Contract, without the prior written consent of Lender; or

(cc)      The occurrence of any default by Borrower, General Partner, or Guarantor in the performance or observance of any agreement or covenant, or breach of any representation or warranty, contained in any material Project Agreement, which shall not be cured by the breaching party within any applicable grace period set forth therein; provided, however, that any non-material breach of any such Project Agreement shall not constitute an Event of Default hereunder unless the non-breaching party under such Project Agreement shall have declared such breach to be a default under such Project Agreement and any applicable cure period shall have expired; or

(dd)      Borrower fails to maintain the required Debt Service Coverage Ratio pursuant to, or otherwise satisfy, the 1st DSCR Test, the 2nd DSCR Test, or the 3rd DSCR Test, as applicable, pursuant to <u>Section 9.10</u> unless, within ten (10) days of the earlier of (i) the date Borrower is required to deliver the Borrower Compliance Certificate required under <u>Section 8.7(c)</u> hereof or (ii) delivery of written notice from Lender, Borrower (a) pays down the outstanding principal balance of the Loan by an amount necessary to cause the Debt Service Coverage Ratio to be restored to the required ratio (the "<u>DSCR Resizing Amount</u>") and agrees to permanently reduce the availability of the Loan by such amount, (b) deposits the DSCR Resizing Amount in a demand deposit account with and pledged to Lender as collateral for the Loan or (c) delivers to Lender an irrevocable letter of credit in the face amount of the DSCR Resizing Amount in form and substance, and issued by a financial institution, satisfactory to Lender in its sole discretion, and having an "evergreen provision" and expiring not earlier than thirty (30) days after the Maturity Date, to be held as collateral for the Loan; or

(ee)      The failure to deliver any of the financial statements, Borrower Compliance Certificate, or Guarantor Compliance Certificates when due pursuant to <u>Section 8.7</u> of this Agreement; or

(ff)      The occurrence of a default under <u>Sections 10.1(a)</u> and <u>10.1(b)</u>; or

(gg)      The occurrence of a breach of any of the Guarantor Financial Covenants; or

(hh)      Borrower fails to satisfy the 1st Rent Test or the 2nd Rent Test, as applicable, and there is a Projected Future DSCR Shortfall, unless, within ten (10) days of the earlier of (i) the date Borrower is required to deliver the Borrower Compliance Certificate required under <u>Section 8.7(c)</u> hereof or (ii) delivery of written notice from Lender, Borrower (a) pays down the outstanding principal balance of the Loan by the Projected DSCR Resizing Amount (defined below) and agrees to permanently reduce the availability of the Loan by such amount, (b) deposits the Projected DSCR Resizing Amount in a demand deposit account with and pledged to Lender as collateral for the Loan or (c) delivers to Lender an irrevocable letter of credit in the face amount of the DSCR Resizing Amount in form and substance, and issued by a financial institution, satisfactory to Lender in its sole discretion, and having an "evergreen provision" and expiring not earlier than thirty (30) days after the Maturity Date, to be held as collateral for the Loan. As used herein, "<u>Projected Future DSCR Shortfall</u>" means a scenario in which Borrower is projected to not be able to satisfy the 3rd DSCR Test based upon a calculation that assumes the pro forma occupancy rates and the actual average rental during the 1st Rent Test Calculation Period and/or

the 2nd Rent Test Calculation Period, as applicable; and "<u>Projected DSCR Resizing Amount</u>" means the principal reduction of the Loan that is required in order to eliminate the Projected Future DSCR Shortfall

11.2    <u>Remedies Upon Default</u>.  Upon the occurrence and during the continuance of any Event of Default, Lender shall take such action or actions as Lender may direct, at Lender's option and in its absolute discretion, including, but not limited to, any or all of the following actions:

(a)    Terminate any obligation or responsibility on the part of Lender to make further advances of Loan Proceeds or of any other amounts held by Lender and constituting security for the Obligations pursuant to this Agreement or any other Loan Document;

(b)    Declare the outstanding principal balance of the Loan, together with all accrued interest thereon and other amounts owing in connection therewith, to be immediately due and payable in full, regardless of any other specified due date, and in the event of the occurrence of an Event of Default under <u>Section 11.1(e)</u> such principal and interest shall become immediately due automatically;

(c)    In its own right or by a court-appointed receiver, take possession of the Property, enter into contracts for and otherwise proceed with the completion of the Project, and pay the costs thereof out of the proceeds of the Loan; and in the event that such costs exceed the total of such funds, Lender shall have the right but not the obligation to pay such excess costs by expenditure of their own respective funds; and/or

(d)    Exercise any of its rights under the Loan Documents and any rights provided by applicable law, including the right to foreclose on any security and exercise any other rights with respect to any security, all in such order and manner as Lender elects in its absolute discretion.

11.3    <u>Cumulative Remedies, No Waiver</u>.  Lender's rights and remedies under the Loan Documents are cumulative and in addition to all rights and remedies provided by Applicable Law from time to time.  The exercise or direction to exercise by Lender of any right or remedy shall not constitute a cure or waiver of any default, nor invalidate any notice of default or any act done pursuant to any such notice, nor prejudice Lender in the exercise of any other right or remedy.  No waiver of any default shall be implied from any omission by Lender to take action on account of such default if such default persists or is repeated.  No waiver of any default shall affect any default other than the default expressly waived, and any such waiver shall be operative only for the time and to the extent stated.  No waiver of any provision of any Loan Document shall be construed as a waiver of any subsequent breach of the same provision.  The consent by Lender to any act by Borrower requiring further consent or approval shall not be deemed to waive or render unnecessary Lender's consent to or approval of any subsequent act. Lender's acceptance of the late performance of any obligation shall not constitute a waiver by Lender of the right to require prompt performance of all further obligations; Lender's acceptance of any performance following the sending or filing of any notice of default shall not constitute a waiver of Lender's right to proceed with the exercise of remedies for any unfulfilled obligations; and Lender's acceptance of any partial performance shall not constitute a waiver by Lender of any rights relating to the unfulfilled portion of the applicable obligation.

11.4    <u>Investor Notice and Cure Rights</u>.  Borrower acknowledges and agrees that Lender shall deliver to the Investor, concurrently with Lender's delivery to Borrower, a copy of any written notice of default given by Lender to Borrower, and Investor shall have the same period of time as Borrower under the Loan Documents to cure such default, as otherwise permitted herein.

11.5    <u>Purchase Option</u>.  In addition to the remedies provided in <u>Section 11.2</u>, Lender may sell and assign the Loan to Investor, as provided in this <u>Section 11.5</u>.  If an Event of Default has occurred and continuing, then, prior to Lender's exercise of any receivership or foreclosure remedies under Sections

11.2(c) and (d), above (such receivership and foreclosure remedies, a "Purchase Option Event"), Lender shall first provide the Investor with written notice of such Purchase Option Event and the Investor's right to purchase the Loan (a "Purchase Option Notice"). Upon Investor's receipt of a Purchase Option Notice, the Investor shall have the right to purchase, in whole but not in part, the Loan (the "Purchase Option") for a price equal to the outstanding principal balance of the Note, together with all accrued interest and other amounts due thereon that are required to be paid by Borrower under the Loan Documents, including, without limitation, all costs and expenses (including legal fees and expenses) incurred by Lender in enforcing the terms of the Loan Documents (the "Loan Purchase Price"). The Purchase Option may only be exercised, if at all, upon the satisfaction of the following: (a) Investor delivers written notice to Lender within five (5) business days after Investor's receipt of the Purchase Option Notice (the "Election Notice"); and (b) in accordance with the remainder of this Section 11.5, Investor and Lender close on the purchase of the Loan within thirty (30) days of Investor receiving the aforesaid Purchase Option Notice from Lender ("Purchase Closing"). The failure to satisfy one of the aforementioned conditions in (a) or (b) shall in either case be deemed to be Investor's waiver of its Purchase Option under this Section 11.5. The Purchase Closing shall include, without limitation, the following: (i) Investor shall pay to Lender the Loan Purchase Price in immediately available funds; (ii) Lender shall deliver or cause to be delivered to the Investor all Loan Documents held by or on behalf of Lender, and to the extent that an original Note is not available, Lender shall provide a lost note affidavit to the Investor in commercially reasonable form, reasonably acceptable to Lender; and (iii) Investor and Lender shall execute in favor of the Investor or its designee assignment documentation, in form and substance acceptable to Lender in its sole discretion, at the sole cost and expense of the Investor, to assign the Loan and Lender's rights under the Loan Documents (without recourse, representations or warranties). Except as expressly provided herein, Lender's rights under this Agreement, whether in Section 11.2 or otherwise, and all other Loan Documents remain unmodified.

12.    **MISCELLANEOUS**.

   12.1    Nonliability. Borrower acknowledges and agrees that:

      (a)    the relationship among Borrower and Lender is and shall remain solely that of Borrower and Lender, and Lender does not undertake or assume any responsibility to review, inspect, supervise, approve or inform Borrower of any matter in connection with the Project, including matters relating to: (i) the Plans, (ii) architects, engineers, contractors, subcontractors and materialmen, or the workmanship of or materials used by any of them, or (iii) the progress of the Project and its conformity with the Plans; and Borrower shall rely entirely on its own judgment with respect to such matters and acknowledges that any review, inspection, supervision, approval or information supplied to Borrower by Lender in connection with such matters is solely for the protection of Lender and that neither Borrower nor any third party is entitled to rely on it;

      (b)    notwithstanding any other provision of any Loan Document: (i) Lender is not and shall be deemed a partner, joint venturer, alter-ego, manager, controlling person or other business associate or participant of any kind of Borrower and Lender does not intend to ever assume any such status; (ii) Lender does not intend to ever assume any responsibility to any Person for the quality or safety of the Property, and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower;

      (c)    Lender shall not be directly or indirectly liable or responsible in any way for any loss, cost, damage, penalty, expense, liabilities or injury of any kind to any Person or property resulting from any construction (including without limitation the construction of the Project) on, or development, occupancy, ownership, management, operation, possession, condition or use of, the Property (except to the extent proximately caused by Lender's or Lender's proven gross negligence or willful misconduct, or caused by events arising after Lender takes title to the Property through a foreclosure or conveyance in lieu of foreclosure or a receiver is appointed at

Lender's request over the Property), including without limitation those resulting or arising directly or indirectly from: (i) any defect in any building or other onsite or offsite improvement; (ii) any act or omission of Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; or (iii) any accident on the Property or any fire or other casualty or hazard thereon; and

       (d)     By accepting or approving anything required to be performed or given to Lender under the Loan Documents, including any certificate, financial statement, Survey, Appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency or legal effect of the same, and no such acceptance or approval shall constitute a warranty or representation by Lender to anyone.

12.2    <u>Indemnification of Lender</u>.

       TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AGREES TO INDEMNIFY, HOLD HARMLESS AND DEFEND LENDER, AND EACH OF ITS OFFICERS, MEMBERS, DIRECTORS, OFFICIALS, EMPLOYEES, ATTORNEYS AND AGENTS (COLLECTIVELY, THE "<u>INDEMNIFIED PARTIES</u>"), AGAINST ANY AND ALL LOSSES, DAMAGES, CLAIMS, ACTIONS, LIABILITIES, COSTS AND EXPENSES OF ANY CONCEIVABLE NATURE, KIND OR CHARACTER (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES, LITIGATION AND COURT COSTS, AMOUNTS PAID IN SETTLEMENT AND AMOUNTS PAID TO DISCHARGE JUDGMENTS) TO WHICH THE INDEMNIFIED PARTIES, OR ANY OF THEM, MAY BECOME SUBJECT UNDER OR ANY STATUTORY LAW (INCLUDING FEDERAL OR STATE SECURITIES LAWS) OR AT COMMON LAW OR OTHERWISE, ARISING OUT OF OR BASED UPON OR IN ANY WAY RELATING TO:

       (i)     (A) the making of the Loan; (B) a claim, demand or cause of action that any Person has or asserts against Borrower, any Partner or Guarantor; (C) the payment of any commission, charge or brokerage fee incurred in connection with the Loan; (D) any act or omission of Borrower, any of their respective agents, employees, licensees, contractor, subcontractor or material supplier, engineer, architect or other Person with respect to the Loan or the Project; (E) the construction, development, ownership, occupancy, management, operation, possessing condition or use of the Property (except to the extent proximately caused by Lender's proven gross negligence or willful misconduct, or caused by events arising after Lender takes title to the Property through a foreclosure or conveyance in lieu of foreclosure or a receiver is appointed at Lender's request over the Property); (F) the Loan Documents, the Project Agreements, or the execution or amendment thereof, or in connection with any of the transactions contemplated thereby, including without limitation, the making of the Loan; and (G) any lien or charge upon payments by Borrower to Lender hereunder, or any taxes (including, without limitation, ad valorem taxes and sales taxes), assessments, impositions and other charges imposed in respect of all or any portion of the Property;

       (ii)     any act or omission of Borrower or any of its agents, contractors, servants, employees or licensees in connection with the Loan or the Project, the operation of the Property, or the condition, environmental or otherwise, occupancy, use, possession, conduct or management of work done in or about, or from the planning, design, acquisition, or construction of, the Project or any part thereof; and

       (iii)     any violation of any environmental law, rule or regulation with respect to, or the release of any toxic substance from, the Property or any part thereof (except to the extent proximately caused by Lender's proven gross negligence or willful

misconduct, or caused by events arising after Lender takes title to the Property through a foreclosure or conveyance in lieu of foreclosure or a receiver is appointed at Lender's request over the Property).

except in the case of the foregoing indemnification of Lender or any of the other Indemnified Parties, to the extent such damages are caused by the gross negligence or willful misconduct of such Indemnified Party; and provided that this Section is not intended to give rise to a right of Lender to claim payment of the principal and accrued interest with respect to the Loan as a result of an Indemnified Party claim. In the event that any action or proceeding is brought against any Indemnified Party with respect to which indemnity may be sought hereunder, Borrower, upon written notice from the Indemnified Party, shall assume the investigation and defense thereof, including the employment of counsel selected by the Indemnified Party, and shall assume the payment of all expenses related thereto, with full power to litigate, compromise or settle the same in its sole discretion; provided that the Indemnified Party shall have the right to review and approve or disapprove any such compromise or settlement. Each Indemnified Party shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and Borrower shall pay the reasonable fees and expenses of such separate counsel; provided, however, that such Indemnified Party may only employ separate counsel at the expense of Borrower if in the judgment of such Indemnified Party a conflict of interest exists by reason of common representation or if all parties commonly represented do not agree as to the action (or inaction) of counsel.

(a)    Notwithstanding any transfer of the Property to another owner in accordance with the provisions of this Agreement, Borrower shall remain obligated to indemnify each Indemnified Party pursuant to this Section if such subsequent owner fails to indemnify any party entitled to be indemnified hereunder, unless such Indemnified Party has consented to such transfer and to the assignment of the rights and obligations of Borrower hereunder.

(b)    The rights of any persons to indemnity hereunder and rights to payment of fees and reimbursement of expenses pursuant to this Agreement shall survive the final repayment of the Loan. The provisions of this Section shall survive the termination of this Agreement.

12.3    <u>Reimbursement of Lender</u>. Borrower shall reimburse Lender for all Loan Expenses immediately upon written demand. Such reimbursement obligations shall bear interest following written demand at the Default Rate until paid, and shall be secured by the Loan Documents. Such reimbursement obligations shall survive the cancellation of the Note and the release and reconveyance of the Loan Documents.

12.4    <u>Obligations Unconditional and Independent</u>. Notwithstanding the existence at any time of any obligation or liability of Lender to Borrower, or any other claim by Borrower against Lender in connection with the Loan or otherwise, Borrower hereby waives any right it might otherwise have (a) to offset any such obligation, liability or claim against Borrower's obligations under the Loan Documents or (b) to claim that the existence of any such outstanding obligation, liability or claim excuses the nonperformance by Borrower of any of its obligations under the Loan Documents.

12.5    <u>Notices</u>. Any notices, communications and waivers under this Agreement shall be in writing and shall be (a) delivered in person, (b) mailed, postage prepaid, either by registered or certified mail, return receipt requested,  (c) sent by overnight express carrier or (d) sent by electronic mail, addressed in each case as follows:

| To Lender: | Fifth Third Bank, National Association |
| | 200 E. Las Olas Blvd, Suite 1200 |
| | MD BMME2A |
| | Ft. Lauderdale, FL 33301 |
| | Attn:  Mark Peterson |

With a copy to:

Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, Texas  75201
Attn:  Clifton M. Dugas, II
Phone:  (214) 999-4004
Email:  cdugas@foley.com

To Borrower:

TAWR Property Owner, Ltd.
200 East Basse Road, Suite 300
San Antonio, Texas 78209
Attn:  Darren Casey

With a copy to:

Golden Steves & Gordon LLP
200 East Basse Road, Suite 200
San Antonio, Texas 78209
Attn:  Karl P. Baker

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto.  All notices sent pursuant to the terms of this section shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight, express carrier, then on the next Business Day immediately following the day sent, (iii) if sent by registered or certified mail, then on the earlier of the third Business Day following the day sent or when actually received, or (iv) if sent by electronic mail, on the date sent (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; provided, however, no notice of breach or default hereunder sent by Lender, and no notice of any kind sent by Borrower, may be given solely by electronic mail, and a copy of any such notice delivered by electronic mail must simultaneously be sent by one of the delivery methods set forth in clauses (i), (ii) or (iii) above in order for such notice to be effective.

12.6    Survival of Representations and Warranties.  All representations and warranties of Borrower and Guarantor in the Loan Documents shall survive the making of the Loan and have been or will be relied on by Lender and Lender notwithstanding any investigation made by Lender or Lender, as the case may be.

12.7    Signs.  Subject to compliance with applicable Laws, Lender may place reasonable signs on the Property during the term of the Loan stating that financing is being provided by and through Lender and any other participant in the Loan.

12.8    No Third Parties Benefited.  This Agreement is made for the purpose of setting forth rights and obligations of Borrower and Lender, and no other Person shall have any rights hereunder or by reason hereof.

12.9    Binding Effect, Assignment of Obligations.  This Agreement shall bind, and shall inure to the benefit of, Borrower and Lender and their respective successors and assigns.  Borrower shall not assign any of its rights or obligations under any Loan Document without the prior written consent of Lender, which consent may be withheld in Lender's absolute discretion.  Any such assignment without such consent shall be void.

12.10   <u>Counterparts</u>.  Any Loan Document may be executed in counterparts, all of which, taken together, shall be deemed to be one and the same document.

12.11   <u>Prior Agreements; Amendments; Consents</u>.  This Agreement (together with the other Loan Documents) contains the entire agreement among Lender and Borrower with respect to the Loan, and all prior negotiations, understandings and agreements (including, but not limited to, any commitment letter issued by Lender to Borrower) are superseded by this Agreement and such other Loan Documents. No modification of any Loan Document (including waivers of rights and conditions) shall be effective unless in writing and signed by the party against whom enforcement of such modification is sought, and then only in the specific instance and for the specific purpose given. Notwithstanding the foregoing, Lender shall have the right to waive or modify, conditionally or unconditionally, the conditions to its approvals and consents hereunder, without the consent of any party.  Consents and approvals to be obtained from Lender shall be in writing.

12.12   <u>Governing Law</u>.  All of the Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without regard to the conflicts of laws principles thereof; provided that if Lender has greater rights or remedies under federal law, then such right and/or remedies under federal law shall also be available to Lender.

12.13   <u>Severability of Provisions</u>.  No provision of any Loan Document that is held to be unenforceable or invalid shall affect the remaining provisions, and to this end all provisions of the Loan Documents are hereby declared to be severable.

12.14   <u>Headings</u>.  Article and section headings are included in the Loan Documents for convenience of reference only and shall not be used in construing the Loan Documents.

12.15   <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, this Agreement shall prevail; provided however that, with respect to any matter addressed in both such documents, the fact that one document provides for greater, lesser or different rights or obligations than the other shall not be deemed a conflict unless the applicable provisions are inconsistent and could not be simultaneously enforced or performed.

12.16   <u>Time of the Essence</u>.  Time is of the essence of all of the Loan Documents.

12.17   <u>Participations, Pledges and Syndication and Securitization</u>.

(a)     Lender may transfer, assign, sell and/or grant participations in the Loan or any of them at any time, in whole and in part, and may furnish any transferee, assignee, purchaser or participant or prospective transferee, assignee, purchaser or participant with any and all documents and information (including without limitation, financial information) relating to Borrower, any Partner, Guarantor, and the Loan or any of them that Lender deems advisable in connection therewith.  Borrower's indemnity obligations under the Loan Documents shall also apply with respect to any transferee, assignee, purchaser or participant and the directors, officers, agents and employees of any transferee, assignee, purchaser or participant.  Borrower, its Partners and Guarantor or any of his, her, its or their respective Affiliates or subsidiaries shall not be given an opportunity to be a transferee, assignee, purchaser or participate under any circumstances without the prior, written consent of Lender which may be withheld in its sole and absolute discretion.

(b)     In the event of any such transfer, assignment, sale or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among, themselves.  In connection with any such transfer, assignment, sale or participation, Borrower further agrees that the Loan Documents shall be sufficient evidence of the obligations of Borrower to each transferee, assignee, purchaser,

or participant, and upon written request by this Lender, Borrower shall enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such transfer, assignment, sale or participation, as the case may be.

12.18   <u>Rights to Share Information</u>.  Lender shall have the right to discuss the affairs of Borrower with any Partner thereof, Guarantor and/or other third parties and to discuss the course of construction, lease-up, operation and management of the Project, the financial condition of Borrower, Guarantor and the Property, and to disclose any non-confidential information received by Lender regarding Borrower, Guarantor, the Property or any Partner of Borrower with any other Partner of Borrower, Guarantor and/or other third parties, singularly or together, as Lender may choose in its sole and absolute discretion.

12.19   <u>Pledge to Federal Reserve</u>.  Anything in this Agreement to the contrary notwithstanding, without notice to or consent of any party or the need to comply with any of the formal or procedural requirements of this Agreement, Lender and/or any transferee, assignee, purchaser or participant may (to the fullest extent permitted under applicable law) at any time and from time to time pledge and assign any or all of its right, title and interest in, to and under all or any of the Loan or the Loan Documents to a Federal Reserve Bank.

12.20   <u>Guaranties Unsecured</u>.  The Loan Documents shall secure Borrower's obligations under the Loan Documents.  Notwithstanding the fact that the Loan Documents may now or hereafter include one or more Guaranties and/or other documents creating obligations of Persons other than Borrower, and notwithstanding the fact that any Loan Document may now or hereafter contain general language to the effect that it secures "the Loan Documents," no Loan Document shall secure any Guaranty, or any other obligation of any Person other than Borrower, unless such Loan Document specifically describes such Guaranty or other obligation as being secured thereby.

12.21   [<u>RESERVED</u>.]

12.22   <u>JURY WAIVER</u>.   BORROWER AND LENDER HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY RELATIONSHIP BETWEEN BORROWER AND LENDER.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE LOAN DESCRIBED HEREIN AND IN THE OTHER LOAN DOCUMENTS.

12.23   <u>JURISDICTION AND VENUE</u>.   BORROWER HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY BORROWER AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN THE CIRCUIT COURT OF TRAVIS COUNTY, TEXAS, OR THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION.  BORROWER HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO LENDER AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT.  BORROWER WAIVES ANY CLAIM THAT TRAVIS COUNTY, TEXAS OR THE WESTERN DISTRICT OF TEXAS IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE.  SHOULD BORROWER, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT,

PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, BORROWER SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR BORROWER SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND BORROWER HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

12.24    Patriot Act.  Lender (for itself and not on behalf of any other party) hereby notifies Borrower that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 ("Patriot Act"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

12.25    Right of Setoff.  Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's accounts with Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law.  Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all Obligations against any and all such accounts.

12.26    Times.  All references of the time of performance of any obligation of Borrowers or Guarantor contained herein or in any the Loan Documents shall mean Eastern Standard Time, Ft. Lauderdale, Florida.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

<u>**BORROWER:**</u>

**TAWR PROPERTY OWNER, LTD.,**
a Texas limited partnership

By:    Tacara Weiss Ranch Investors GP, LLC,
       a Texas limited liability company,
       its General Partner

      By:    TAWR Preferred Partnership, LP,
            a Delaware limited partnership,
            its Sole Member

            By:    Tacara at Weiss Ranch GP, LLC,
                   a Texas limited liability company,
                   its General Partner

                By: _____
                    Darren B. Casey, its Manager

<u>**LENDER:**</u>

**FIFTH THIRD BANK, NATIONAL ASSOCIATION**

By:_____
Name:_____
Title:_____

(Signature Page to Construction Loan Agreement)

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

<div style="margin-left: 2em">

**BORROWER:**

**TAWR PROPERTY OWNER, LTD.,**
a Texas limited partnership

By:    Tacara Weiss Ranch Investors GP, LLC,
       a Texas limited liability company,
       its General Partner

      By:    TAWR Preferred Partnership, LP,
       a Delaware limited partnership,
       its Sole Member

            By:    Tacara at Weiss Ranch GP, LLC,
       a Texas limited liability company,
       its General Partner

                  By: _____
                Darren B. Casey, its Manager


**LENDER:**

**FIFTH THIRD BANK, NATIONAL ASSOCIATION**

By: _____
Mark Peterson, Senior Vice President

</div>